Exhibit 1

## COMPROMISE AND SETTLEMENT AGREEMENT

This Compromise and Settlement Agreement (the "Settlement Agreement") is entered into by and between Defendant SVTC Technologies, Inc. ("SVTC Inc.") for itself and on behalf of SVTC Solar, Inc.; and SVTC Technologies, LLC (the three companies, collectively, "SVTC"), on the one hand, and Plaintiff Hoa Tran ("Class Plaintiff"), on behalf of himself and on behalf of each person who is a member of the WARN Class (as defined in paragraph A.3 below) and thus eligible to participate in the settlement (collectively the "Class Members") on the other hand.  SVTC, the Class Plaintiff and the Class Members are sometimes collectively referred to in the Settlement Agreement as the "Parties."

## RECITALS

1.      On September 24, 2013, Plaintiff, a former employee of SVTC, acting on behalf of a putative class, filed an action against SVTC, captioned *Hoa Tran v. SVTC Technologies, et al.*, Case No. 12-03034-EJD (the "Action").  Plaintiff alleged that SVTC violated the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* (the "WARN Act") as well as California Labor Code § 1400 *et seq.* (the "California WARN Act") by failing to provide 60 days' notice of termination to employees who worked at the corporate offices and fabrication facilities in San Jose, California, and fabrication facility in Austin, Texas, and who were terminated on or about September 28, 2012.

2.      On or about October 15, 2012, SVTC Technologies, LLC, executed a general assignment for the benefit of creditors ("Assignment") in favor of California Assignments, LLC. Prior to the Assignment SVTC sold it's Austin, Texas, fabrication facility to Tezzaron Semiconductor which then rebranded the facility to operate as Novati Technologies, Inc. and hired most or all of SVTC's workers at that facility.

3.      On October 17, 2012, SVTC answered the allegations in the Complaint in the WARN Action, set forth a number of affirmative defenses and disputed all claims.

4.      On October 31, 2012, SVTC filed a "Request for Exception from the California WARN Act § 1402.5" with the Director of the California Department of Industrial Relations.

5.      On or about November 30, 2012, SVTC Solar, Inc., completed an asset sale to the Research Foundation for the State University of New York on behalf of the College of Nanoscale Science and Engineering.

6.      SVTC Inc., which is the parent company of SVTC Solar, Inc., and SVTC Technologies, LLC, also plans to liquidate.

7.      There are significant, complex legal and factual issues regarding whether the WARN Act and California WARN Act apply to the terminations at issue and the viability of the WARN Act claims in connection with the termination of the Class Members.  SVTC contends that it did not violate the WARN Act or California WARN Act based on numerous affirmative defenses and has filed a petition for exemption from the WARN Act with the state of California. SVTC also contends that even if liability were found, the amount of damages would be far less than Plaintiff alleges, and may unlikely be recovered given the strained financial position of SVTC and the ongoing liquidation of the company.

8.      The Parties have engaged in informal document discovery and shared their respective analyses of the legal and factual issues relevant to the claims in an effort to assess the relative merits of the claims of the plaintiff and the defenses to those claims.  The Parties agree that the discovery conducted in the Actions has been sufficient to assess reliably the merits of the respective parties' positions and to compromise the issues on a fair and equitable basis.

5293877.1/45058-00001

9.      To avoid extensive, costly litigation over these issues, the Parties engaged in negotiations regarding a possible global resolution of the Action.  As a result of those negotiations, the Parties have agreed to fully and finally compromise, settle, and resolve any and all demands, claims, damages, and causes of action, present and future, which were asserted or could have been asserted in the Action, including, but not limited to, any claims against SVTC for back pay or benefits based on or arising out of any federal, state or local statute, ordinance or regulation (the "WARN Class Claims"), on the terms set forth below.

## TERMS AND CONDITIONS OF SETTLEMENT

## A.      SETTLEMENT AMOUNT, CONDITIONAL CERTIFICATION AND PRELIMINARY APPROVAL PROCEDURE

1.      SVTC agrees to cause to be paid the total amount of $117,500 to resolve the WARN Class Claims, which shall include all amounts to be paid in exchange for this settlement and compromise, including, without limitation, attorneys' fees and costs, including the costs of administration of the settlement, which include but are not limited to employer taxes associated with the payments made to individuals ("Settlement Amount").

2.      This Settlement Agreement is subject to, and conditioned upon, entry of the Final Approval Order (as defined in paragraph B.7) by the District Court approving the Settlement Agreement under Rule 23 of the Federal Rules of Civil Procedure, in accordance with applicable law and local rules.  The Class Plaintiff will file a Motion for Conditional Certification and Preliminary Approval of Settlement pursuant to Federal Rule of Civil Procedure 23 (the "Preliminary Approval Motion") in the Action seeking an Order in substantially the form attached to this Settlement Agreement as Exhibit A ("Preliminary Approval Order").  At the hearing on the Preliminary Approval Motion, Class Plaintiffs will request that the District Court

3

set a hearing, to be conducted after completion of the notice procedures set forth in

paragraphs B.1 through B.4 below, for the purpose of determining the fairness, adequacy and

reasonableness of the settlement ("Fairness Hearing").

       3.     The Parties agree, for settlement purposes only, that the District Court may

conditionally certify the following class in connection with the WARN Action pursuant to Rule

23(b)(3) of the Federal Rules of Civil Procedure:

> "All persons who were employed by SVTC in San Jose, California and were
> terminated on or within 45 days of September 28, 2012, without receiving a full
> 60 days' notice in advance of their termination."

"WARN Class Members" shall mean all individuals included within the definition of the WARN

Class.  The "WARN Settlement Class Members" shall mean all WARN Class Members, with the

exception of those individuals who timely notify Class Counsel that they elect not to participate

in this settlement, *i.e.*, elect to "Opt Out," in accordance with the procedures set forth in

paragraph B.3 below.

       4.     SVTC consents to the appointment of Girard Gibbs LLP ("Class Counsel") as

class counsel for the Class Members, in pursuing and settling the WARN Class Claims.

       5.     Class Counsel has informed SVTC that they intend to file a motion seeking

attorneys' fees in the amount of up to 25% of the settlement fund, payable from the Settlement

Amount.  SVTC agrees not to oppose a request for attorneys' fees by Class Counsel up to

$29,375.  In addition, Class Counsel has informed SVTC that they intend to seek reasonable

costs payable from the Settlement Amount for out-of-pocket costs and expenses, including the

costs of administration of this settlement, which are expected not to exceed $5,000.   SVTC

agrees not to oppose Class Counsel's request for costs and expenses, which are expected not to

exceed $7,500.  The payment to Class Counsel of attorneys' fees and costs, as may be awarded

4

by the District Court, shall constitute payment in full for Class Counsel's work on behalf of the Class Members. The attorneys' fees and costs paid to Class Counsel shall, upon approval by order of the District Court shall constitute the entirety of attorneys' fees paid to Class Counsel.

6.     The Parties agree, for purposes of settlement only, that Plaintiff Tran is an adequate class representative for the WARN Class.

7.     Class Counsel has informed SVTC that they intend to retain a "Claims Administrator" to assist them in the administration of the settlement, including the distributions to WARN Settlement Class Members in the amounts required by the Settlement Agreement and as directed by Class Counsel. The Claims Administrator shall establish a settlement fund to effectuate the distribution of the Settlement Amount as provided by the Settlement Agreement and the orders of the District Court.

8.     In addition to distributing payments to Settlement Class Members, the Claims Administrator will also distribute to Class Counsel the attorneys' fees and costs approved by the District Court and provide each Class Counsel with an IRS Form 1099 for such amounts.

**B.     NOTICE PROCEDURES, OPT OUTS AND FINAL APPROVAL PROCEDURE**

1.     SVTC agrees to cause to be transmitted to the Claims Administrator and Class Counsel, within five business days following the entry of the Preliminary Approval Order described in paragraph A.2, a list of the names and last known addresses of the Class Members, which shall also include each WARN Class Member's rate of compensation.

2.     Class Counsel shall provide each WARN Class Member with a settlement notice in a form substantially similar to that attached hereto as Exhibit B ("WARN Settlement Notice") and a notice of election to opt out of the settlement in substantially the form attached to this

5

Settlement Agreement as <u>Exhibit C</u> (the "Opt-Out Notice Form"). Class Counsel shall transmit the WARN Settlement Notices and Opt-Out Notice Forms via first-class mail addressed to the WARN Class Members at the addresses provided by SVTC no later than 10 business days after SVTC causes to be transmitted the Class Member List to the Claims Administrator and Class Counsel.

3.       Any Class Member wishing to Opt Out must complete and sign an Opt-Out Notice Form and send the completed and signed Opt-Out Notice Form via first class mail to Class Counsel or (at the address provided on the Opt-Out Notice Form) not later than 45 days after Class Counsel mails the Class Settlement Notice and Opt-Out Notice Form to the Class Members (the "Opt-Out Bar Date"). The Class Settlement Notices and Opt-Out Notice Form will specify the Opt-Out Bar Date. Any Opt-Out Notice Form received by Class Counsel in an envelope bearing a postmark on or before the Opt-Out Bar Date will be deemed timely. Any Class Member who mails the Opt-Out Notice Form by the Opt-Out Bar Date shall be deemed to have "Opted Out." Five business days after the Opt-Out Bar Date, Class Counsel shall provide SVTC and the Claims Administrator a list of the Class Members who have Opted Out.

4.       Each Class Member who does not mail an Opt-Out Notice Form by the Opt-Out Bar Date will be bound by this settlement.

5.       If any Class Member, timely and properly Opts Out of the proposed WARN Class, that Class Member's rights and obligations will be unaffected by this Settlement Agreement and that Class Member shall have the same rights and obligations as he or she would have had if the WARN Action had never been filed and this Settlement Agreement had never been executed. Any Class Member who Opts Out shall retain his or her rights against SVTC, if any. SVTC reserves all rights against any Class Members who Opt Out.

6

6.      Notwithstanding anything to the contrary in this Settlement Agreement, in the event that the number of WARN Class Members who Opt Out meets or exceeds 15% of the total number of WARN Class Members, SVTC may, upon consultation with the Plaintiff in good faith, elect to terminate the Settlement Agreement as to the WARN Action within 15 days after the Opt-Out Bar Date.

7.      Following the Fairness Hearing, the Parties will submit a final proposed order (a) approving this Settlement Agreement and the payment of attorneys' fees and costs to Class Counsel in the amount awarded by the Court ("Final Approval Order"), and (b) dismissing the action with prejudice in substantially the form attached hereto as Exhibit D.

8.      If the Court for any reason does not enter the Final Approval Order or the Final Judgment, then:

a.    The Settlement Agreement, the recitals contained herein and the stipulated certification of the WARN Class shall be deemed null and void *ab initio* and shall be of no force or effect whatsoever, and the Parties and Class Members shall be deemed to have reverted to their respective status as of the date and time immediately prior to the execution of this Settlement Agreement;

b.    SVTC, or any other party-in-interest shall be free to object to and/or defend against the Settled Claims or any other claims asserted by the proposed Class Members.  Execution of this Settlement Agreement SVTC does not waive any defense or objection to any claims asserted or that may be asserted by the proposed Class Members;

c.    Neither this Settlement Agreement, nor any of the statements contained herein, shall be admissible in any proceeding involving the Parties for any purpose

7

whatsoever nor shall any Party refer to or utilize this Settlement Agreement in any proceeding involving the Parties, except one to enforce its terms; and

    d.   Neither the Preliminary Approval Motions nor any of the pleadings filed in support of the Preliminary Approval Motions shall be admissible in any proceeding involving the Parties.

9.    If SVTC elects to terminate this Settlement Agreement as to the WARN Action pursuant to paragraph B.8, then:

    a.   The Settlement Agreement and the recitals contained herein as to the WARN Action and the stipulated certification of the WARN Class shall be deemed null and void *ab initio* and shall be of no force or effect whatsoever, and the Parties and WARN Class Members shall be deemed to have reverted to their respective status as of the date and time immediately prior to the execution of this Settlement Agreement;

    b.   SVTC, or any other party-in-interest shall be free to object to and/or defend against the WARN Class Claims or any other claims asserted by the proposed WARN Class Members.  Execution of this Settlement Agreement by SVTC does not waive any defense or objection to any claims asserted or that may be asserted by the proposed WARN Class Members;

    c.   Neither this Settlement Agreement, nor any of the statements contained herein, shall be admissible in any proceeding involving the Parties for any purpose whatsoever nor shall any Party refer to or utilize this Settlement Agreement in any proceeding involving the Parties; and

     d.   Neither the Preliminary Approval Motions nor any of the pleadings filed in

          support of the Preliminary Approval Motions shall be admissible in any

          proceeding involving the Parties.

**C.**    **SETTLEMENT PAYMENTS**

    1.    "Settlement Effective Date" means the later of the date following the entry of a
Final Judgment, and either (i) the expiration of the time for filing of an appeal from the Court's
entry of a Final Judgment, or (ii) if a timely appeal is filed, the final resolution of that appeal
(including any requests for rehearing and/or petitions for review).

    2.    Within 10 business days after the Settlement Effective Date, SVTC shall cause to
be remitted the Settlement Amount of $117,500, to the Claims Administrator.  The money
remaining for distribution to Settlement Class Members, after payment of settlement
administration expenses, and attorneys' fees and costs as approved by the Court to Class
Counsel, shall be allocated to the Settlement Class Members as set forth in paragraphs C.3.

    3.    Each WARN Settlement Class Member will be entitled to a payment derived by
allocating a pro rata amount to each WARN Settlement Class Member based on the maximum
amount of his or her potential claim.  The payments to WARN Settlement Class Members shall
be calculated as follows:

     a.   The potential claim of each WARN Settlement Class Member will be derived by

          (1) calculating each WARN Settlement Class Member's daily rate which is

          determined for hourly employees by multiplying their hourly rate times 8 and for

          salaried employees by dividing their bi-weekly pay by 10 and then (2) multiplying

          each WARN Settlement Class Member's daily rate by (i) 60 days if the Class

          Member was terminated on or before September 24, 2012; or (ii) the number of

9

days between the Class Member's termination date and November 23, 2012 if the

Class Member was terminated between September 25, 2012 and November 23,

2012 ("Individual WARN Claim");

b.      The "Aggregate WARN Claim" will be calculated by adding all of the Individual

WARN Claims together;

c.      Each WARN Settlement Class Member's "Pro Rata Factor" will be calculated by

dividing (i) each WARN Settlement Class Member's Individual WARN Claim by

(ii) the Aggregate WARN Claim;

d.      The amount each WARN Settlement Class member shall receive under this

Settlement Agreement shall then be calculated by multiplying (i) $117,500 less

that portion of settlement administration expenses, attorneys' fees and costs as

approved by the District Court, by (ii) each WARN Settlement Class Member's

Pro Rata Factor.

4.      Class Counsel shall, within five (5) days after the entry of the Final Judgment,

provide to the Settlement Administrator, a list of each WARN Settlement Class Member and the

amount each such individual will receive based upon the formulas set forth in paragraphs C.3

above (as to each such individual, the "Settlement Payment").

5.      The Claims Administrator shall withhold any employee payroll tax withholdings

required by federal, state or local law from the distributions to the Settlement Class Members

receiving payments under this Settlement Agreement and shall issue a Form W-2 reflecting such

payments to each Settlement Class Member.  These amounts shall include the employee and

employer portion of all applicable federal, state and local taxes.  For purpose of calculating

5293877.1/45058-00001

applicable taxes, the Parties agree that 100% of the amounts to be paid to the Settlement Class

Members shall constitute wages reportable on IRS Form W-2.

      6.      If any settlement checks mailed to Settlement Class Members remain uncashed as

of the 181st day after the Claims Administrator mails the settlement checks to the Settlement

Class Members, such funds (the "Residual Funds") shall be disbursed first to any Settlement

Class Members who were unidentified at the time the Claims Administrator issued the Class

Settlement Notices, such claims being paid based on the formulas set forth in paragraphs C.3,

and then second, as a *cy pres* distribution to the Legal Aid Society – Employment Law Center of

San Francisco.  No portion of the Residual Funds will revert to SVTC for any reason, or be

retained by Class Counsel.

## D.    <u>RELEASE OF CLAIMS</u>

      1.      Except for the rights arising out of, provided for, or reserved in this Settlement

Agreement, upon the payment of the Settlement Amount to the Claims Administrator, the

Settlement Class Members, for and on behalf of themselves, and their respective successors and

assigns (collectively, the "Releasing Parties"), do hereby fully and forever release and discharge

SVTC and their respective officers, directors, shareholders, agents, employees and other agents,

and all of their respective predecessors, successors and assigns (collectively, the "Released

Parties"), of and from any and all claims, demands, debts, liabilities, obligations, liens, actions

and causes of action, costs, expenses, attorneys' fees and damages of whatever kind or nature, at

law, in equity and otherwise, whether known, unknown, anticipated, suspected or disclosed,

which the Releasing Parties may now have or hereafter may have against the Released Parties,

which relate to or are based on the WARN Act, California WARN Act, or any obligations to pay

wages or benefits under any federal, state or local law or regulation arising out of the termination

of the Class Members' employment with SVTC, including, but not limited to the Settled Claims.

The claims released hereunder are referred herein as the "Released Claims." The Released

Parties expressly reserve the right to object to, offset or oppose any and all claims, obligations, or

causes of action, of any type, except those claims expressly allowed hereunder.

2.      The following claims and/or rights shall not be released under paragraph D.1:

(a) any claims for continuation of health or medical coverage, at the Class Member's expense, or

at the expense of a beneficiary or dependent of a Class Member, to the extent allegedly required

by the relevant provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985

("COBRA"); (b) rights, if any, unrelated to any claims under the WARN Action, under SVTC's

401(k) plans; and (c) any claims that the law clearly states may not be released by settlement.

3.      The Releasing Parties and Class Counsel acknowledge that they are familiar with,

and/or, in the case of the Class Members, have been informed by the Class Settlement Notices of

the provisions of California Civil Code § 1542, which provides as follows:

> A general release does not extend to claims which the creditor does not
> know or suspect to exists in his or her favor at the time of executing the
> release, which if known by him or her must have materially affected his or
> her settlement with the defendant.

4.      With respect to the Released Claims being released hereunder, the Releasing

Parties waive and relinquish, to the fullest extent that the law permits, the provisions, rights and

benefits of California Civil Code § 1542 and other statutes, regulations or common law

principles of similar effect. Such release, however, shall not release SVTC's obligations under

this Settlement Agreement. The Releasing Parties hereby agree and acknowledge that this

waiver and relinquishment is an essential term of this Settlement Agreement, without which the

consideration provided to them would not have been given. In connection with such waiver and

relinquishment, the Releasing Parties and Class Counsel acknowledge that they are aware that

5293877.1/45058-00001

they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true, with respect to the matters released herein.  Nevertheless, it is the intent of the Releasing Parties and Class Counsel in executing this Settlement Agreement fully, finally, and forever to settle and release all such matters, and all claims relative thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action or proceeding) which are the subject of the releases granted hereunder.

5.      Approval of this Settlement Agreement by the District Court and payment of the Settlement Amount to the Claims Administrator shall operate as a full release of the Released Parties by the Releasing Parties of all Released Claims.  Upon the payment of the Settlement Amount to the Claims Administrator, all Released Claims are deemed settled, released and dismissed in their entirety, on the merits, with prejudice.

**E.      ADDITIONAL TERMS**

1.      The Parties agree that they are compromising and settling disputed claims.  Other than as set forth herein, each of the Parties shall bear its own attorney's fees, expenses and court costs.  Each of the Parties agrees it shall not commence or continue any contested matter, adversary proceeding, lawsuit, or arbitration which contests, disputes, or is inconsistent with any provision of this Settlement Agreement.

2.      This Settlement Agreement is intended to settle and dispose of all claims which are contested and denied and which relate to the WARN Action.  Nothing in this Settlement Agreement shall be construed as an admission by SVTC, of any liability or wrongdoing of any kind, and SVTC specifically denies any such liability or wrongdoing.

13

3.      Neither this Settlement Agreement nor any of its provisions, nor evidence of any negotiations or proceedings related to this Settlement Agreement, shall be offered or received in evidence in the District Court, or any other action or proceeding, as an admission or concession of liability or wrongdoing of any nature on the part of any of the Released Parties, or anyone acting on their behalf.  Nothing herein shall prevent any Party from seeking to offer this Settlement Agreement in evidence after the entry of the Final Approval Order for the purpose of enforcing the terms of the Settlement Agreement.

4.      This Settlement Agreement shall be binding upon and shall inure to the benefit of the predecessors, successors and assigns of each of the Parties to the fullest extent under the law.

5.      This Settlement Agreement shall be construed pursuant to the laws of the State of California.

6.      This Settlement Agreement and the Exhibits hereto represent the entire agreement and understanding between the Parties as to the subject matter hereof and supersede all previous agreements and discussions between the Parties as to the matters herein addressed.  This Settlement Agreement can be amended or modified only in writing and signed by all the Parties hereto, subject to any necessary District Court or other approval.

7.      The Parties may not waive any provision of this Settlement Agreement except by a written agreement that all of the Parties have signed.  A waiver of any provision of this Settlement Agreement shall not constitute a waiver of any other provision.

8.      This Settlement Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute but one agreement.  This Settlement Agreement may be executed by facsimile or PDF and such facsimile or PDF signature shall be treated as an original signature hereunder.

9.     This Settlement Agreement has been prepared by the joint efforts of the respective attorneys for each of the Parties.  Each and every provision of this Settlement Agreement shall be construed as though each and every party hereto participated equally in the drafting hereof.  As a result of the foregoing, any rule that the document is to be construed against the drafting party shall not be applicable.

10.     This Settlement Agreement is subject to and contingent upon the approval by the District Court and, thus, the District Court shall have exclusive jurisdiction to determine any dispute or controversy with respect to the interpretation or enforcement of this Settlement Agreement.

DATED: May __2__, 2013                    SVTC

                                                        By _Gerald Hatten_____

                                                        Its _Attorney in Fact_____


DATED: May ____, 2013                    _____
                                                                          Hoa Tran

9.      This Settlement Agreement has been prepared by the joint efforts of the respective attorneys for each of the Parties.  Each and every provision of this Settlement Agreement shall be construed as though each and every party hereto participated equally in the drafting hereof.  As a result of the foregoing, any rule that the document is to be construed against the drafting party shall not be applicable.

10.     This Settlement Agreement is subject to and contingent upon the approval by the District Court and, thus, the District Court shall have exclusive jurisdiction to determine any dispute or controversy with respect to the interpretation or enforcement of this Settlement Agreement.

DATED:  April ____, 2013              SVTC


                                      By_____

                                      Its_____


DATED:  April ____, 2013              _____
                                                      Hoa Tran

5146474.2 / 45058-00001

Exhibit A

Eric H. Gibbs (California Bar No. 178658)
Matthew B. George (California Bar No. 239322)
Scott Grzenczyk (California Bar No. 279309)
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile:  (415) 981-4846
ehg@girardgibbs.com
mbg@girardgibbs.com
smg@girardgibbs.com

*Counsel for Individual and Representative Plaintiff Hoa Tran*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOA TRAN,<br><br>Plaintiff,<br><br>v.<br><br>SVTC TECHNOLOGIES, INC.; SVTC SOLAR, INC.; SVTC TECHNOLOGIES, LLC,<br><br>Defendants. | Case No: 5:12-cv-04970-EJD<br><br>**[PROPOSED] ORDER GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Judge:     Edward J. Davila<br>Date:     July 12, 2013<br>Time:     9:00 a.m.<br>Courtroom:  4 |

Upon consideration of the *Motion for Preliminary Approval of Settlement of Class Action* (the "Motion") filed by Plaintiff Hoa Tran in the above-captioned case seeking preliminary Court approval of the parties' settlement of this action (the "Settlement") on the terms set forth in the *Compromise and Settlement Agreement* (the "Settlement Agreement"), and the Declaration of Matthew B. George filed in support thereof, and having reviewed and considered the terms and conditions of the proposed Settlement as set forth in the Settlement Agreement, a copy of which has been submitted with the Motion and the terms of which are incorporated in this Order; and no opposition to the Motion having been submitted; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 1331 and 1367, as well as 29 U.S.C. §§ 2102, 2104(a)(5), and also venue being proper before the Court pursuant to 28 U.S.C. § 1391(b) and (c), and Section 2104 of the WARN Act; and upon the hearing on the Motion and after due deliberation, and good and sufficient cause appearing therefore;

**IT IS HEREBY ORDERED:**

1.       Capitalized terms used in this Order that are not otherwise identified herein have the meaning assigned to them in the Settlement Agreement.

2.       The terms of the Settlement Agreement are hereby preliminarily approved, subject to further consideration at the Fairness Hearing provided for below.  The Court concludes that the Settlement is sufficiently within the range of reasonableness to warrant the preliminary approval of the Settlement, conditional certification of the WARN Class, the scheduling of the Fairness Hearing, and the mailing of notice to WARN Class Members, each as provided for in this Order.

3.       The Court preliminarily finds, for purposes of settlement only, that the requirements of Rule 23(a) of the Federal Rules of Civil Procedure appear to be satisfied:  (1) the WARN Class is sufficiently numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the WARN Class; (3) the claims or defenses of Plaintiff Tran are typical of the claims or defenses of the WARN Class Members; and (4) Plaintiff Tran will fairly and adequately protect the interests of the WARN Class Members.

[PROPOSED] ORDER GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

4. The Court preliminarily finds, for purposes of settlement only, that the requirements of Rule 23(b)(3) of the Federal Rules of Civil Procedure appear to be satisfied: (1) questions of law or fact common to the WARN Class Members predominate over any questions affecting only individual members; and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**<u>Conditional Certification of the WARN Class</u>**

5. For purposes of settlement only, the WARN Action is conditionally certified pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure as a class action on behalf of the WARN Class, defined as follows:

> All persons who were employed by SVTC in San Jose, California and were terminated on or within 45 days of September 28, 2012, without receiving a full 60 days' notice in advance of their termination.

6. For the purpose of facilitating the settlement, the Court designates Plaintiff Tran as the Class Representative.

7. For the purpose of facilitating the settlement, the Court designates Girard Gibbs LLP as Class Counsel.

8. The conditional certification of the WARN Class and designation of the Class Representatives and Class Counsel are solely for purposes of effectuating the Settlement. If the Settlement Agreement is terminated or is not consummated for any reason, the foregoing conditional certification of the class and designation of the Class Representative and Class Counsel shall be void and of no further effect, and the parties to the Settlement shall be returned to the status each occupied before entry of this Order without prejudice to any legal argument that any of the parties to the Settlement Agreement might have asserted in the WARN Action.

9. The Court approves the retention by Class Counsel of Gilardi & Co. as the Claims Administrator.

3

[PROPOSED] ORDER GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

10.     The Court approves the WARN Settlement Notice, attached as Exhibit B to the Settlement Agreement and the WARN Opt-Out Notice Form, attached as Exhibit C to the Settlement Agreement.

**Form and Timing of Notice**

11.     Not later than ten (10) business days after the entry of this Order, Class Counsel shall cause copies of the Settlement Notice and Opt-Out Notice Form, substantially in the form of Exhibit B and Exhibit C to the Settlement Agreement, to be mailed by first-class mail, postage pre-paid, to all WARN Class Members through the notice procedure described in the Settlement Agreement.

12.     At least fourteen (14) calendar days prior to the Fairness Hearing, Class Counsel shall serve and file a sworn statement attesting to compliance with the service of the Settlement Notice and Opt-Out Notice Form as set forth above.

13.     The Court finds that the notice to be provided by first class mail as set forth in this Order is the best means of providing notice to the Class Members, is practicable under the circumstances and, when completed, shall constitute due and sufficient notice of the Settlement and the Fairness Hearing to all persons affected by and/or entitled to participate in the Settlement or the Fairness Hearing, in full compliance with the requirements of due process and the Federal Rules of Civil Procedure.

**Ability of Class Members to Opt Out of the Settlement Class**

14.     All Class Members who wish to Opt Out of the WARN Class must follow the procedures set forth in the Class Notice and Opt-Out Notice Form. At least fourteen (14) calendar days prior to the Fairness Hearing, Class Counsel shall file a sworn statement by the setting forth the names and addresses of each member of the WARN Class Member who elected to Opt Out.

15.     Any WARN Class Member who does not properly and timely Opt Out from the Settlement shall be included in the WARN Class and, if the Settlement is approved and becomes effective, shall be bound by all the terms and provisions of the Settlement Agreement, including but not limited to the Release of Claims described therein, whether or not such person shall have objected to the

4

[PROPOSED] ORDER GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

1  Settlement and whether or not such person makes a claim upon, or participates in, the settlement fund or

2  the other benefits to the WARN Class to be provided under the Settlement Agreement.

3  **Fairness Hearing; Right to Appear and Object**

4        16.    A hearing (the "Fairness Hearing") shall take place before this Court, at 280 South 1st

5  Street, San Jose, California, Courtroom 4, 95113, on [ADD], 2013 *[at least 90 days after the date the*

6  *Court Grants Preliminary Approval of Class Action Settlement]* to determine:

7            a.    Whether the Court should permanently certify the WARN Class and whether the

8  Plaintiff and Class Counsel have adequately represented the class;

9            b.    Whether the Settlement, on the terms and conditions provided for in the

10  Settlement Agreement, should be finally approved by the Court as fair, reasonable and adequate;

11            c.    Whether the WARN Action should be dismissed with prejudice;

12            d.    Whether the Court should permanently enjoin the assertion of any claims that

13  arise from or relate to the subject matter of the WARN Action against the Released Parties in the

14  Agreement;

15            e.    Whether the application for attorneys' fees and expenses to be submitted by Class

16  Counsel should be approved; and

17            f.    Such other matters as the Court may deem necessary or appropriate.  The Court

18  may finally approve the Settlement at or after the Fairness Hearing with any modifications agreed to by

19  the Parties and without further notice to the Class Members.

20        17.    Class Counsel shall serve and file their application for attorneys' fees and costs and their

21  application for the payment of Service Payments to the WARN Class Representatives by not later than

22  _____, 2013 *[30 days after notice is mailed]*.

23        18.    Any objection to the Settlement or any matter to be considered at the Fairness Hearing

24  must be in writing and mailed to the addresses below not more than forty-five (45) calendar days after

25  Class Counsel mails the Settlement Notice to the Class Members ("Objection Deadline").  The

26  Objection Deadline shall be specified in the Settlement Notice.  Any written objection must also be

27

28  [PROPOSED] ORDER GRANTING PRELIMINARY APPROVAL OF CLASS ACTION
SETTLEMENT

served by the Objection Deadline, either by hand delivery or by first-class mail, postage prepaid, to the following counsel:

**THE COURT:**

Hon. Edward J. Davila
United States District Court
Northern District of California
280 South 1st Street, Courtroom 4
San Jose, California 95113

**CLASS COUNSEL:**

Eric H. Gibbs, Esq.
Girard Gibbs LLP
601 California Street, 14th Floor
San Francisco, California 94108
(415) 981-4800

**SVTC'S COUNSEL:**

Gerald T. Hathaway
Mitchell Silberberg & Knupp LLP
12 East 49th Street, 30th Floor
New York, New York 10017-1028

19.    Any WARN Class Member who has not Opted Out, and any other interested person, may appear at the Fairness Hearing in person or by counsel and be heard, to the extent allowed by the Court, either in support of or in opposition to the matters to be considered at the Fairness Hearing.  However, no person shall be heard, and no papers, briefs or other submissions shall be submitted unless such person mails a notice of intention to appear at the Fairness Hearing, along with a statement setting forth such person's objections, if any, to the matter to be considered and the basis for the objections to the Court and Class Counsel by the deadline set forth in the Notice.

20.    Any responses to any written objections to the Settlement and any other matter in support of Final Approval of the Settlement and Plaintiff's Motion for attorneys' fees and costs shall be filed with the Court not later than fourteen (14) calendar days prior to the Fairness Hearing.

[PROPOSED] ORDER GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

21.     The Court may adjourn the Fairness Hearing, including the consideration of the application for attorneys' fees and expenses, without further notice of any kind other than an announcement of such adjournment in open court at the Fairness Hearing or any adjournment thereof.

**IT IS SO ORDERED.**

DATED: _____ 2013            _____

Edward J. Davila
U.S. District Judge

7

Exhibit B

**UNITED STATES DISTRICT COURT**
**FOR THE NORTERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

**NOTICE OF PROPOSED SETTLEMENT OF CLASS ACTION**
**CONCERNING "WARN ACT" CLAIMS**

*The United States District Court for the Northern District of California authorized this notice. This is not a solicitation from a lawyer.*

# If You Are A Former Employee of SVTC Who Was Terminated from Your Employment As A Consequence Of A Mass Layoff And/Or Plant Closing On Or About September 28, 2012, And You Received Less Than 60 Days' Advance Notice Of Your Termination, You Are Entitled To Benefits Under This Settlement.

# Please Read This Notice Carefully. Your Legal Rights Are Affected Whether You Act or Not.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
| --- | --- |
| **PARTICIPATE IN THE SETTLEMENT** | If you agree with the proposed settlement, you need not take any action to be included in the settlement. If the Court approves the settlement, you will be entitled to receive benefits under the settlement as explained below. |
| **EXCLUDE YOURSELF** | You may exclude yourself from the settlement. Sections 12 through 14 below explain this option. You will not be entitled to participate in the settlement if you choose this option. |
| **OBJECT OR COMMENT** | You may write the Court about why you do, or do not, like the settlement. You must elect to remain in the class and participate in the settlement to be able to comment in support of or in opposition to the settlement. |
| **ATTEND THE HEARING** | You may file an objection or comments with the Court and request an opportunity to speak to the Court about the fairness of the settlement. |

These rights and options— and the deadlines to exercise them— are explained in this notice.

The Court in charge of this case still has to decide whether to approve the settlement. Payments will be made if the Court approves the settlement and after any appeals are resolved.

## BASIC INFORMATION

**1.      Why did I get this notice package?**

You have received this notice because SVTC's records indicate that you worked for SVTC Technologies, Inc., SVTC Solar, Inc., or SVTC Technologies, LLC, and that you were terminated from your employment on or about September 28, 2012 as part of a mass layoff or plant closing without receiving 60 days' advance notice of your termination.

The Court authorized us to send you this notice because you have a right to know about a proposed settlement of a class action lawsuit, and about all of your options, before the Court decides whether to approve the settlement.  If the Court approves the settlement and after any objections and appeals are resolved, the payments that the settlement provides will be made. This notice explains the lawsuit, the settlement, your legal rights, what benefits are available, who is eligible for them, and how to get them.  This notice also explains how you may be excluded from the settlement if you wish to be excluded.

The Court in charge of the case is the United States District Court for the Northern District of California, San Jose Division, Judge Edward J. Davila, and the case is known as Tran v. SVTC Tecnologies, Inc., et al.  The person who sued is called "Plaintiff" or the "WARN Class Representative," and the companies he sued are referred to in this notice as "SVTC."

**2.      What is this lawsuit about?**

Plaintiff alleges that SVTC violated a federal law known as the WARN Act and a similar state law referred to as the California WARN Act by ordering plant closings and/or mass layoffs on or about September 28, 2012, without providing 60 days' advance notice of termination to the employees, and that as a consequence of this failure, employees like you have a claim against SVTC consisting of your wages and benefits for the 60 day violation period.

SVTC denies all of Plaintiff's allegations and has asserted numerous defenses against these claims, including its belief that SVTC was not obligated to provide 60 days' notice under the applicable law.  The settlement is not an admission of wrongdoing or an indication that any law was violated.

**3.      Why is this a class action?**

This case is a class action because approximately 130 employees were affected by SVTC's alleged violation of the WARN Act and the California WARN Act and have similar claims. The people with similar claims are the WARN Class Members.  In a class action, one court resolves the issues for all class members, except for those who exclude themselves from the class.

**4.      Why is there a settlement?**

Litigation is costly, risky, takes a long time, and neither side in this case could predict the outcome or guarantee victory.  The Court did not decide in favor of the Plaintiff or SVTC.  Rather, the parties, after negotiations, agreed to settle the case instead of going forward with litigation and a trial which would create many risks and delays.  One risk is that SVTC petitioned the state of California for an exemption from the WARN Act which could provide a complete defense to the lawsuit.  Another risk is that even if Plaintiff was ultimately successful at trial, there may not be any funds to pay the whole judgment or any part of it because SVTC is in liquidation proceedings and has significant debts and liabilities that likely exceed its assets.  Also, if the case were to go to trial, the losing party might appeal, which could delay the case for years.  This settlement avoids the costs and risks associated with trial and an appeal, while providing cash benefits to members of the class soon.

The WARN Class Representative and his attorneys, who have been appointed as class counsel by the Court ("Class Counsel"), think that the settlement is the best course for the WARN Class Members.  Judge Davila has also granted preliminary approval of the settlement.

## WHO IS IN THE SETTLEMENT

**5.      How do I know if I am part of the settlement?**

The "WARN Class" includes all individuals who were employed by SVTC in San Jose, California and were terminated on or within 45 days of September 28, 2012, without receiving a full 60 days' notice in advance of their termination.  If you fall within this definition, then you are a WARN Class Member and you are part of the settlement.  If you are unsure whether you fall within this definition, please contact the Settlement Administrator or Class Counsel at the phone numbers provided in Paragraphs 12 and 17 below.

**6.      Are there exceptions to being included?**

All people who timely request exclusion will not be included in the settlement.

## THE SETTLEMENT BENEFITS

**7.      What does the settlement provide?**

The Defendants have agreed to pay a total settlement amount of $117,500 in full settlement of the claims of the WARN Class.  This settlement fund includes all payments to the WARN Class Members, Class Counsel's attorneys' fees and expenses, and costs of administration of the Settlement.  Each Class Member who does not choose to exclude themselves from the Settlement will receive a pro rata share of the settlement fund minus the following deductions: Each WARN Class Settlement Member's pro rata share of:

- Attorneys' Fees up to $29,375 (which equals 25% of the total settlement amount), subject to Court approval;

- Attorney Costs including Notice Administration Fees up to $7,500 (collectively, "Fees and Costs").

In addition, each WARN Class Member's settlement payment will be subject to the employee's and employer's share of payroll taxes and withholdings.

The settlement distribution process will be administered by an independent claims administrator ("Claims Administrator") approved by the Court.

| 8. | What can I get from the settlement? |
|---|---|

The WARN settlement fund will be divided among those WARN Class Members who do not elect to be excluded from the settlement.  The parties have endeavored to divide the Settlement Amount in a fair way.  They will use data unique to each Class Member including his or her daily rate of pay and dates of termination to calculate that class member's potential WARN Claim as well as the aggregate amount of the potential WARN Claims for the whole WARN Class.  Each WARN Class Member will receive his or her pro rata share of the settlement fund based on the amount of their potential WARN claim relative to other WARN Class members' potential claims.  For example, if the Class Member's potential WARN claim is 1% of the total potential WARN Claims for the class, the Class Member will receive 1% of the settlement fund.

In addition your share of attorneys' fees and costs, your settlement payment will also be reduced by applicable payroll taxes and other required withholdings.  The parties may make adjustments to the settlement formula during the administration process.

## HOW TO PARTICIPATE IN THE SETTLEMENT

| 9. | How can I get a payment? |
|---|---|

If you are satisfied with the proposed settlement and want to participate in the settlement and receive your distribution, **you do not need to do anything**.

| 10. | When would I get my payment? |
|---|---|

Class action settlements require court oversight as well as notice to all WARN Class Members. This takes time.  SVTC is not required to pay the settlement until at least three things occur: First, notice must be provided to the WARN Class Members, so that they will have time to read this notice.  After the notice period has expired, the Court will hold a fairness hearing and decide whether it should grant final approval of the settlement.  Assuming the settlement is finally approved, SVTC will not have to pay the settlement until the time for appeal has expired.  In all likelihood, all of this will occur by early fall 2013.  If there is an appeal, it will add at least one year, but probably more, to the time when you receive payment. However, Class Counsel encourages WARN Class Members to participate in the settlement and does not expect any appeals.

## 11.    What am I giving up to get a payment or stay in the Class?

Unless you elect to exclude yourself, you are staying in the WARN Class and accepting the settlement.  You will be deemed to have entered into a "Release of Claims" that is part of the written settlement in this case, and you would be subject to and legally bound by all of the Court's orders.  You should understand that the "Release of Claims" is broad, and releases all claims against SVTC related to this lawsuit.  The Release of Claims means that you cannot sue, continue to sue, or be part of any other lawsuit against SVTC about the legal issues that arose because of SVTC's alleged violation of the WARN Act or the California WARN Act or for back pay or benefits arising out of the termination of your employment.  The "Release of Claims" is also set forth in full in the Compromise and Settlement Agreement.  (See Section 23 below for how you may obtain a copy.)

### EXCLUDING YOURSELF FROM THE SETTLEMENT

If you do not want to receive payment under this settlement, and you want to keep the right to assert your claim(s) against SVTC on your own that are related to your claims for alleged WARN damages, then you must take steps to exclude yourself from the class.  This is sometimes referred to as "opting out" of the class.

## 12.    How do I opt out of the settlement?

If you wish to opt out of the settlement, you must complete the enclosed WARN Opt-Out Notice Form and mail the form postmarked no later than [ADD] to:

> Class Counsel
> Eric H. Gibbs
> GIRARD GIBBS LLP
> 601 California Street, 14th Floor
> San Francisco, California 94108
> (415) 981-4800

If you elect to opt out you will not receive any payment as a result of the settlement, and you cannot object to the settlement.  Also, you will not be legally bound by anything that happens in this lawsuit.

## 13.    If I don't exclude myself, can I sue SVTC for the same thing later?

No.  Unless you exclude yourself now, you give up any right to sue SVTC for the claims that this settlement resolves.  If you have a pending lawsuit, speak to your lawyer in that case immediately.  You must exclude yourself from the WARN Class to be able to continue your own lawsuit against SVTC or others described in the Release of Claims in connection with any claims included within the Release of Claims.

## 14.    If I exclude myself, can I get money from this settlement?

No.  If you exclude yourself, you cannot participate in the settlement.

## THE LAWYERS REPRESENTING YOU

### 15.      Do I have a lawyer in the case?

WARN Class Members are represented by Eric H. Gibbs and Matthew B. George, Girard Gibbs LLP, 601 California Street, 14th Floor, San Francisco, California 94108.  You are free to hire a different lawyer at your own expense.

### 16.      How will the lawyers be paid?

Class Counsel will request from the Court, and SVTC has agreed not to oppose, an award in the amount of $29,375 for attorneys' fees and reasonable costs associated with this case, including the cost of administering the settlement.  The Court may award less than these amounts.  The amounts awarded by the court will be paid from the $117,500 amount being paid to settle the WARN claims.

## OBJECTING OR COMMENTING ON THE SETTLEMENT

You can tell the Court that you do or do not agree with the settlement or some part of it.

### 17.      How do I tell the Court that I do or don't like the settlement?

If you do not opt out and, therefore, you are a WARN Settlement Class Member, you can object or comment on the settlement if you do or do not like any part of it.  You can give reasons why you think the Court should or should not approve it.  The Court will consider your views.  To object or comment, you must send a written statement explaining your views on the settlement in *Tran v. SVTC Techologies, Inc., et al.*, Case No. 12-03034-EJD.  Be sure to include your name, address, telephone number, and your signature.  Your objection or comment will not be heard unless it is mailed to the addresses below by no later than [ADD]:

| THE COURT: | CLASS COUNSEL: | SVTC'S COUNSEL: |
|---|---|---|
| Hon. Edward J. Davila | Eric H. Gibbs, Esq. | Gerald T. Hathaway |
| United States District Court | Girard Gibbs LLP | Mitchell Silberberg & Knupp LLP |
| Northern District of California | 601 California Street, | 12 East 49th Street, 30th Floor |
| 280 South 1st Street, | 14th Floor | New York, NY 10017 |
| Courtroom 4 | San Francisco, CA 94108 | |
| San Jose, CA 95113 | (415) 981-4800 | |

### 18.      What's the difference between objecting and excluding myself?

Objecting is simply telling the Court that you don't like something about the settlement.  You can object only if you stay in the WARN Class.  Excluding yourself is telling the Court that you don't want to be part of the WARN Class.  If you exclude yourself, you have no basis to object because the case no longer affects you.

## THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the settlement. You may attend, and you may ask to speak, but you don't have to.

### 19.     When and where will the Court decide whether to approve the settlement?

The Court will hold a Fairness Hearing on [ADD], 2013 at 9:00 a.m., in Courtroom 4, United States District Court for the Northern District of California, 280 South 1st Street, San Jose, California, 95113.  At this hearing, the Court will consider whether the settlement is fair, reasonable, and adequate.  The Court may also decide how much to pay to Class Counsel at this hearing.  If there are objections to the settlement, the Court will consider them.  Judge Davila will listen to people who have filed a Notice of Intention to Appear at the hearing, as explained in Section 21 below.  After the hearing, the Court will decide whether to approve the settlement. We do not know how long these decisions will take.

### 20.     Do I have to come to the hearing?

No.  Class Counsel will answer any questions Judge Davila may have but you are welcome to come.  If you send an objection, you don't have to come to court to talk about it.  As long as you mailed your written objection on time, the Court will consider it.  You may also pay your own lawyer to attend, but it's not necessary.

### 21.     May I speak at the hearing?

You may ask the Court for permission to speak at the Fairness Hearing.  To do so, you must send a letter saying that it is your "Notice of Intention to Appear in Tran v. SVTC Technologies, Inc., et al., Case No. 12-03034-EJD."  Be sure to include your name, address, telephone number, and your signature.  Your Notice of Intention to Appear must be postmarked no later than [DATE], and must be sent to (1) the United States District Court for the Northern District of California, (2) Class Counsel, and (3) SVTC's Counsel, at the addresses listed in Section 17 above.  You cannot speak at the hearing if you opt out of the settlement.

## IF YOU DO NOTHING

### 22.     What happens if I do nothing at all?

If you do nothing, you'll receive your cash payment under the terms of the settlement if the Court approves the settlement.

## GETTING MORE INFORMATION

### 23.     Are there more details about the settlement?

This notice summarizes the settlement.  More details of the settlement are contained in the Compromise and Settlement Agreement.  Copies of the Compromise and Settlement Agreement

and the pleadings and other documents relating to the case are on file at the United States District Court for the Northern District of California, San Jose Division and may be examined and copied at any time during regular office hours at the Office of the Clerk, at the address listed in Section 17 above.  You may also contact Class Counsel identified above, or visit http://www.girardgibbs.com, and they will send or email you a copy.

### 24.      How do I get more information?

If you have questions, please contact the Class Counsel identified in Section 17 above.  **DO NOT CALL THE COURT OR THE OFFICE OF THE UNITED STATES TRUSTEE REGARDING THIS MATTER**.

Exhibit C

## "WARN CLASS" OPT-OUT NOTICE FORM

### *Tran v. SVTC Technologies, Inc., et al.*
### *Case No. 12-03034-EJD*

Enclosed with this form is a notice describing a class action against SVTC regarding its alleged failure to give 60 days' advance notice of termination to employees who were terminated from their employment as a consequence of a mass layoff and/or plant closing on or about September 28, 2012.

**IF YOU CHOOSE TO EXCLUDE YOURSELF FROM THE SETTLEMENT OF THE CLASS ACTION, THEN YOU MUST ACCURATELY FILL OUT AND SIGN THIS FORM AND SEND IT TO CLASS COUNSEL  WITH A POSTMARK DATE NO LATER THAN [ADD].**

PLEASE ADDRESS THIS REQUEST FOR EXCLUSION TO:

> Eric H. Gibbs
> GIRARD GIBBS LLP
> 601 California Street, 14th Floor
> San Francisco, CA 94108

---

I understand that I have the right to elect not to participate in this Settlement.  By signing and returning this form, I also certify that I have read the Notice of Proposed Settlement of Class Action Concerning "WARN Act" Claims in this matter and wish to be excluded from the Settlement.  I understand that this means that I will not receive any payment under the Settlement, and I will not be bound by the Settlement.

IT IS MY DECISION TO BE EXCLUDED FROM THE CLASS ACTION SETTLEMENT AND NOT TO RECEIVE A SETTLEMENT PAYMENT IN THE CLASS ACTION REFERRED TO ABOVE.  I UNDERSTAND THAT I HAVE THE RIGHT TO SEEK THE ADVICE OF COUNSEL AT MY OWN EXPENSE WITH RESPECT TO THIS CHOICE AND HOW IT AFFECTS MY LEGAL RIGHTS, INCLUDING BUT NOT LIMITED TO THE APPLICABLE STATUTE OF LIMITATIONS.

_____
(Signature)

_____
(Type or Print Name)

_____
(Address, City, State, ZIP)

_____
Last 4 Digits of Social Security Number

_____
Telephone Number

Exhibit D

Eric H. Gibbs (California Bar No. 178658)
Matthew B. George (California Bar No. 239322)
Scott Grzenczyk (California Bar No. 279309)
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile:  (415) 981-4846
ehg@girardgibbs.com
mbg@girardgibbs.com
smg@girardgibbs.com

*Counsel for Individual and Representative Plaintiff Hoa Tran*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HOA TRAN,<br><br>                    Plaintiff,<br><br>          v.<br><br>SVTC TECHNOLOGIES, INC.; SVTC SOLAR, INC.; SVTC TECHNOLOGIES, LLC,<br><br>                    Defendants. | Case No: 5:12-cv-04970-EJD<br><br><br>**[PROPOSED] ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |

1    Upon consideration of the *Motion for Approval of Settlement of Class Action* (the "Motion")

2    filed by Plaintiff Hoa Tran in the above-captioned case seeking Court approval of the parties' settlement

3    of this action (the "Settlement") on the terms set forth in the *Compromise and Settlement Agreement* (the

4    "Settlement Agreement"), and the Declaration of Matthew B. George filed in support thereof, and

5    having reviewed and considered the terms and conditions of the proposed Settlement as set forth in the

6    Settlement Agreement, a copy of which has been submitted with the Motion and the terms of which are

7    incorporated in this Order; and no objection or opposition to the Motion having been submitted; and the

8    Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28

9    U.S.C. §§ 1331 and 1367, as well as 29 U.S.C. §§ 2102, 2104(a)(5), and venue being proper before the

10   Court pursuant to 28 U.S.C. § 1391(b) and (c), and Section 2104 of the WARN Act, 29 U.S.C. §

11   2104(a)(5); and upon the hearing on the Motion and after due deliberation, and good and sufficient

12   cause appearing therefore;

13   **THE COURT HEREBY ORDERS, FINDS AND ADJUDGES AS FOLLOWS:**

14   1.     Capitalized terms used in this Order that are not otherwise identified herein have the

15   meaning assigned to them in the Settlement Agreement.

16   **<u>Class Notice</u>**

17   2.     The Court finds that due and proper notice of the Settlement was provided to Class

18   Members, including notice of the right to object to the proposed Settlement, the right to object to Class

19   Counsel's application for attorneys' fees and costs, the right to appear in person or by counsel at the

20   Fairness Hearing and be heard and the right to Opt Out.  The Court finds that the notice provided was

21   the best means of providing notice to the WARN Class Members, was practicable under the

22   circumstances and, constitutes due and sufficient notice of the Settlement and the Fairness Hearing to all

23   persons affected by and/or entitled to participate in the Settlement or the Fairness Hearing, in full

24   compliance with the requirements of due process and Federal Rule of Civil Procedure 23(c)(2)(B),

25   (e)(1), and (h)(1).

26

27

28

[PROPOSED] ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT
AND DISMISSAL OF ACTION WITH PREJUDICE

3.      The Court finds that no objections to the Settlement have been filed with the Court or received by Class Counsel or the Settlement Administrator.

4.      The Court finds that (X) WARN Class Members identified in **Exhibit A** to Class Counsel's Declaration [Docket No. XX] have timely submitted the WARN Opt-Out Notice Form to the Claims Administrator and they are hereby  excluded from the Settlement approved by this Order.

<u>**Certification of the WARN Class**</u>

5.      The Court finds that the requirements of Rule 23(a) of the Federal Rules of Civil Procedure are satisfied:  (1) the WARN Class is sufficiently numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the WARN Class; (3) the claims or defenses of the WARN Class Representative are typical of the claims or defenses of the WARN Class Members; and (4) the WARN Class Representative will fairly and adequately protect the interests of the WARN Class Members.

6.      The Court finds that the requirements of Rule 23(b)(3) of the Federal Rules of Civil Procedure are satisfied:  (1) questions of law or fact common to the WARN Class Members predominate over any questions affecting only individual members; and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

7.      The WARN Action is certified as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the WARN Class, defined as follows:

> All persons who were employed by SVTC in San Jose, California and were terminated on or within 45 days of September 28, 2012, without receiving a full 60 days' notice in advance of their termination.

8.      Except for those identified in Exhibit A to Class Counsel's Declaration [Docket No. XX], who opted out, all other  WARN Class Members shall be included in the WARN Class and shall be bound by all the terms and provisions of the Settlement Agreement, including but not limited to the Release of Claims described therein.

[PROPOSED] ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT
AND DISMISSAL OF ACTION WITH PREJUDICE

**WARN Class Representatives and Class Counsel**

9.      Plaintiff Hoa Tran is hereby designated as the WARN Class Representative.

10.     Girard Gibbs LLP is hereby designated as Class Counsel.

**Settlement Agreement**

11.     The Court finds that the terms of the Settlement Agreement are fair, reasonable, and adequate and are hereby approved on a final basis pursuant to Federal Rule of Civil Procedure 23(e). Specifically, the Court approves in full the Settlement Agreement attached to the *Preliminary Settlement Motion* [Docket No. XX].  The Parties shall comply with and implement the Settlement Agreement according to its terms.

12.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of the Settlement Agreement or this Order.

**Dismissal of Action**

13.     This action is dismissed with prejudice in its entirety.

**IT IS SO ORDERED.**

DATED: _____ 2013

_____
Edward J. Davila
U.S. District Judge

4
[PROPOSED] ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT
AND DISMISSAL OF ACTION WITH PREJUDICE

Exhibit 2

## MITCHELL SILBERBERG & KNUPP LLP

A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

**MS&K**

Steven M. Schneider
A Professional  Corporation
(310) 312-3128 Phone
(310) 231-8328 Fax
sms@msk.com

October 31, 2012

**VIA FEDEX**

The Honorable Christine Baker
Director
Office of the Director
California Department of Industrial Relations
515 Clay Street, Suite 701
Oakland, CA 94612

Re:  **Request for Exception Under Labor Code § 1402.5 (Cal-WARN Act)**
      **Employer:  SVTC Technologies, LLC**

Dear Director Baker:

We write on behalf of SVTC Technologies, LLC ("SVTC"), a wholly-owned subsidiary of SVTC Technologies, Inc. ("SVTC, Inc."), and sister entity to SVTC Solar, Inc. ("SVTC Solar"), to seek exemption from the notice requirements of the California WARN Act, Cal. Lab. Code §§ 1401 *et seq*. (the "Cal-WARN Act"), on the basis that SVTC was an employer actively seeking capital or business at the time notice would have been required within the meaning of Section 1402.5 of Cal-WARN.

Submitted with this letter are affidavits of responsible individuals with knowledge of the facts described in the affidavits, and documents, all authenticated in the affidavits.

## I.    FACTUAL BACKGROUND

### A.    THE BUSINESS OF SVTC

Originally founded in July of 2004 as Silicon Valley Technology Center, a wholly-owned subsidiary of Cypress Semiconductor Corp, SVTC spun out as a separate, privately-owned company in March 2007 when it was purchased by a number of funds managed by two financial entities: Oak Hill Capital Partners and Tallwood Venture Capital. In 2007, SVTC merged with SEMATECH's Advanced Technology Development Facility, effectively doubling its capabilities and services. In June 2008, SVTC Solar, was launched, taking SVTC's business model for the semiconductor industry and optimizing it for the development of photovoltaic (i.e., solar cell) products. In April 2011, the U.S. Department of Energy ("DOE") awarded SVTC Solar $25M in funding as a part of the DOE's SunShot Initiative which was implemented to make large-scale

11377 West Olympic Boulevard, Los Angeles, California 90064-1683
Phone: (310) 312-2000 Fax: (310) 312-3100 Website: www.msk.com

4940008.1/00121-00052

MITCHELL SILBERBERG & KNUPP LLP

The Honorable Christine Baker
October 31, 2012
Page 2

photovoltaic solar energy systems competitive with other forms of energy and eliminate the industry's reliance on subsidies by the end of the decade.

When it was operating, SVTC was a premier innovation partner for accelerating nanotechnology development and commercialization. SVTC's proven advanced technology and secure Intellectual Property infrastructure combined with its Technology Development Process supported companies developing Microelectromechanical systems (MEMS), microfluidics, novel transistors, photovoltaics and other nanotechnologies for the Semiconductor, Life Sciences and Aerospace & Defense markets. SVTC's advanced technology centers provided customers with a "clean room," technology building blocks, engineering expertise, professional program management and a broad complement of flexible processing that enabled the accelerated development of silicon-based solutions. One advanced technology center is located in Austin, Texas, and has been sold. The other advanced technology center is located in San Jose, California, and that center has ceased operations, and is in the process of closing.

The San Jose Advanced Technology Center was located at 3901 North First Street, San Jose CA 95134, in Santa Clara County. The San Jose facility primarily focused on 8 inch silicon wafer disks.

SVTC's state-of-the-art San Jose development and manufacturing facility included a 27,000 square foot clean room that offered customers the ability to come into the clean room and avail themselves of the following capabilities to help speed the transformation of semiconductor ideas and concepts into market-ready products:

- 200mm (8") Production-grade development equipment
- More than 250 process, metrology and analytical tools
- Support for introduction of novel materials and process architectures
- Process Library with more than 1,500 SPC-controlled recipes
- 85 nm electrical fab monitor and transistor characterization flow
- Cu and Al back-ends
- Advanced set of atomic layer deposition (ALD) and novel materials capabilities
- 65 nm lithography

In its fabrication ("fab") facilities, SVTC offered a wide range of 200 mm (8") development tools, including:

- Lithography, including 193 nm high NA lithography
- Dry Etch
- Wet Etch/Clean
- Diffusion
- Thin Films
- CMP

MITCHELL SILBERBERG & KNUPP LLP

The Honorable Christine Baker
October 31, 2012
Page 3

- Metrology
- Implantation - Low, Medium and High Dose
- Failure Analysis

SVTC also incorporated analytical services offerings with its existing technology development capabilities, thus extending its value throughout the growing ecosystem of emerging technology development.  SVTC equipment for analytical services included:

- Atomic Force Microscopy (AFM)
- Auger-Electron Spectroscopy (AES)
- Focused Ion Beam (FIB)
- Dual-Beam FIB/SEM
- Secondary Ion Mass Spectrometry Low-Energy SIMS depth profiles
- Scanning Electron Microscopy (SEM)
- Scanning Transmission Electron Microscopy (STEM)
- Transmission Electron Microscopy (TEM)
- High-resolution TEM
- Vapor Phase Decomposition Inductively Coupled Plasma Mass Spectroscopy (VPD-ICP-MS)

The facts stated above are included at the following website: www.svtc.com.

As of July 2012, approximately 135 employees worked in the San Jose Advanced Technology Center.  The facility was also used by additional employees of customers that were developing their own high tech products.  Customers could avoid the high expense of creating a clean room, and purchasing the extremely costly tools and processes by contracting with SVTC. In many cases, employees of customers of SVTC were physically inside the SVTC clean room, often working side-by-side with SVTC employees.

**B.      SVTC'S CHANGE IN FINANCIAL STANDING**

In late June 2012, despite revenue growth projections for the calendar quarters ending in December 2012 and March 2013, SVTC began taking certain proactive measures to ensure the stabilization of cash flow and the avoidance of any liquidity constraints through these periods.

Specifically, on or about June 27, 2012, representatives of SVTC and Oak Hill Capital Partners ("Oak Hill Capital"), began a dialogue with Bryce Dakin, Managing Director of GCA Savvian Advisors, LLC ("GCA Savvian"), an independent investment banking firm, regarding the possible retention of GCA Savvian to assist SVTC in evaluating strategic combinations, as well as raising capital.  Those communications resulted in Mr. Dakin forwarding an email to Jack Sexton, SVTC's Chief Financial Officer, and David Scott, a principal of Oak Hill Capital, on June 27, 2012, setting forth proposed engagement terms.  (*See* email chain from June 27,

MITCHELL SILBERBERG & KNUPP LLP

2012, June 29, 2012 and July 2, 2012 entitled "engagement terms" attached as Exhibit A; *See also* Affidavits of Jack Sexton, dated October 29, 2012 and Bryce Dakin, dated October 26, 2012.)

In addition, on June 29, 2012, Bert Bruggeman, SVTC's Founder and Chief Executive Officer ("CEO"), had an initial meeting with the President and CEO, of Company A[1], an entity engaged in accelerating research and development for semiconductor and clean energy industries, to discuss the possibility of Company A making some type of investment in SVTC, whether by way of a merger with all or part of SVTC's business, a contribution of capital to SVTC, the purchase of specific SVTC inventory or some strategic combination.  That initial meeting led to a follow up meeting on July 13, 2012, between Mr. Bruggeman, the President and CEO of Company A, Robert ("Bob") Morse Jr., a Partner of Oak Hill Capital, and Mr. Sexton. Mr. Bruggeman and Mr. Sexton, representing SVTC, Inc., were assisted in their strategic approach and preparation of presentation materials for that meeting by GCA Savvian's representatives, despite the fact that GCA Savvian had yet to be formally engaged.  (*See* Affidavits of Jack Sexton and Bryce Dakin.)  Mr. Morse later summarized the content of the meeting, during which the attendees had an in-depth analysis of the potential customer, capability and financial benefits of any investment arrangement, in a July 13, 2012 email to the Board of Directors of SVTC, noting that the President and CEO, of Company A "seemed to appreciate the level of thought that went into the discussion from [SVTC's] side," and "agreed to speak with his CFO and get back to [Mr. Bruggeman] later next week with thoughts." (*See* July 13, 2012 email from Mr. Morse to the Board, and presentation slides from the July 13, 2012 meeting attached as Exhibit B.)

On or about July 3, 2012, Mr. Sexton, along with Mr. Bruggeman and John Hamma, SVTC's Vice President of Sales, began discussions around the creation of a program whereby SVTC could raise short term cash from its existing customer base independent of any engagement of GCA Savvian.  (*See* email chain from July 3, 2012 and July 5, 2012 entitled "Cash/pre-payment" attached as Exhibit C; *See also* Affidavit of Jack Sexton.)  Those discussions culminated in the formation of an initial draft of the program by Mr. Sexton, which was forwarded to Mr. Hamma and Mr. Bruggeman on July 5, 2012.  In that draft, Mr. Sexton identified ten (10) key customers that would be targeted for the receipt of certain benefits, such as discounting, prioritization, and inventory management, in exchange for a substantial prepayment, under the auspices of an "A-Level" Customer Prepayment Program.  It was expected that through the program SVTC could raise an estimated $4M-$6M in short term growth capital, which could then be used for expenditures associated with SVTC's Semiconductor and Solar Customer Development Programs.

---

[1]  In an effort to preserve confidentiality required by the nature of the communications between SVTC and its potential investors, many of whom executed Non-Disclosure Agreements, potential investors are not identified by name in this position statement.  Instead, they are referred to, in order of appearance, as "Company A," "Company B," etc.  For the same reasons, the names of potential investors and their respective representatives have been redacted from the attached exhibits and supporting affidavits.  This firm shall maintain a master list containing the names of the potential investors and their assigned pseudonyms, which shall be released, upon request to, and with the guidance of, the Office of Director, in a manner that maintains investor anonymity.

MITCHELL SILBERBERG & KNUPP LLP

The Honorable Christine Baker
October 31, 2012
Page 5

Thereafter, the proposed Customer Prepayment Program underwent further development and modifications by Mr. Sexton, Mr. Hamma and Mr. Bruggeman, in anticipation of it being presented to SVTC's Board for review and approval during its July 17, 2012 meeting. In so doing, Mr. Hamma and Mr. Bruggeman each engaged in preliminary discussions with two (2) existing customers, Denso and Advantec, respectively, for the purpose of gauging their interest in participating in the program. As noted below, those discussions remained ongoing through early September 2012, resulting in SVTC's receipt of a $750,000 commitment from Denso, which SVTC ultimately elected not to accept following the decision to close the San Jose facility. However, those discussions did not yield a prepayment or commitment from Advantec.

On July 17, 2012, the Board of Directors of SVTC held a meeting during which factors impacting SVTC's cash flow were discussed, along with the need for an injection of funds to support SVTC's overall operations, including that of SVTC Solar. In this regard, particular attention was given to the two fundraising options for which a framework had already been established, but which required Board approval: (1) the Customer Prepayment Program, wherein the goal of raising an estimated $4M-$6M in capital remained, but with the expectation that it would be accomplished by September 2012; and (2) the engagement of GCA Savvian to assist with acquiring approximately $15M in capital. They also discussed fundraising efforts specific to SVTC Solar, to replace the loss of expected investment funds from Pacific Gas & Electric ("PG&E"). Specific reference was made to discussions with Company B and Company C, that were conducted during the week of July 9, 2012, by the President of SVTC Solar Gunter Ziegenbalg regarding the purchase of equity in SVTC Solar. (*See* presentation slides from the July 17, 2012 Board meeting attached as Exhibit D; *See also* Affidavit of Jack Sexton.) Lastly, a discussion took place regarding Executive Management's recommendation to the Board to consolidate SVTC's operating activities into a single fab in order to reduce operating expenses and improve cash flow. (*See* Affidavit of Jack Sexton.)

Following the Board meeting and receipt of the Board's approval to proceed with the fundraising options as presented, SVTC officially implemented its Customer Prepayment Program, and otherwise continued its capital raising efforts both independent of and in conjunction with GCA Savvian, with whom it had executed a formal engagement letter and standard indemnification letter dated July 27, 2012. (*See* Parties' fully-executed engagement letter and standard indemnification letter, dated July 27, 2012, attached as Exhibit E; *See also* Affidavits of Jack Sexton and Bryce Dakin.)

In late July 2012, however, SVTC's initial revenue projection, which was presented at the July 17, 2012 Board Meeting as being in a range between $16,800,000 and $17,200,000 in the September 2012 quarter, was reduced to $15,400,000, and later below $15,000,000, which created a revenue shortfall that was bound to have a critical impact on liquidity. (*See* Affidavit of Jack Sexton.) Recognizing this fact, the Board and Executive Management team became concerned that revenue growth projections for the quarters ending in December 2012 and March 2013 quarters would also not be realized. As a result, the company was compelled to significantly expedite its fundraising efforts overall to address increasing liquidity constraints.

## MITCHELL SILBERBERG & KNUPP LLP

The Honorable Christine Baker
October 31, 2012
Page 6

### 1.  *SVTC's Efforts to Raise Capital*

Beginning in late July 2012, the full Board began receiving periodic updates regarding SVTC's liquidity status and fundraising action items.  In addition, SVTC began to provide regular updates to and conduct weekly meetings with the Board's Audit Committee ("AC"), wherein attendees discussed SVTC's liquidity status and short-term action items to address the liquidity shortage, including the Customer Prepayment Program, other short term liquidity sources and a planned Fab Consolidation restructuring program.  (*See* Affidavit of Jack Sexton.)

On July 24, 2012, Mr. Bruggeman provided the Board with a summary and updated report on SVTC's financial status and efforts to raise short term capital through customer prepayments. (*See* July 24, 2012 email summary and updated report from Mr. Bruggeman attached as Exhibit F.)  In his summary, Mr. Bruggeman noted that a short-term prepayment goal of approximately $4M had been identified, which was designated, not only to contribute to funding SVTC, Inc.'s operations over the next 3-4 quarters, but also to contribute to satisfying commitments made previously to the DOE to have "non-federal funds" available to expend in the October and November 2012 time frame, secured by the end of the first Program Year. (*See* Affidavit of Jack Sexton.)  He added that it was "critical" that SVTC receive initial cash from the Prepayment Program by the end of August 2012 because the company's net liquidity position by the week of August 26, 2012 was expected to essentially be at zero, absent the receipt of the additional cash flow.  To address this issue, Mr. Bruggeman reported that SVTC was conducting face-to-face customer meetings to target 9 top opportunities, 5 of which represented semiconductor customers that were sizable entities capable of absorbing the amount and duration of the prepayments being sought, and 4 of which represented SVTC Solar customers.

At the time, SVTC had already been actively engaged in discussions with these 9 customers and was awaiting additional feedback.  Specifically, Mr. Hamma had initiated communications with Schlumberger and Denso.  Mr. Bruggeman had initiated communications with Advantec, Semtech and Ion Torrent.  Finally, Mr. Ziegenbalg had been in communications with SVTC Solar's customers, ALG Solar, Morroco Solar Farm, Celestica and PG&E/CPUC.

The content of Mr. Bruggeman's July 24, 2012 summary was reiterated in greater detail to the AC during its July 27, 2012 meeting.  (*See* presentation slides from the July 27, 2012 AC meeting attached as Exhibit G; *See also* Affidavit of Jack Sexton.)  In addition, the AC discussed the fact that discussions were ongoing with Sandisk, SVTC's largest customer, to provide a prepayment of $1.5M and Sematech's prepayment terms were back in discussion with a closing targeted for the end of August 2012.  Further, the AC discussed delays in payments and the potential impact it would have on operations, possible cost cutting options, and the total reduction in cash outflows for Q2'13.  Finally, GCA Savvian was a topic of discussion with respect to its engagement, upcoming meetings to be coordinated with SVTC, Inc. and its list of target investors for capital.  (*See* Affidavit of Jack Sexton.)

By the August 3, 2012 AC meeting, it had been concluded that there would likely be a need for bridge financing by week ending August 26, 2012, due to the fact that prepayment

MITCHELL SILBERBERG & KNUPP LLP

The Honorable Christine Baker
October 31, 2012
Page 7

discussions with customers, while ongoing, were not likely to yield funding until the end of September. (*See* presentation slides from the August 3, 2012 AC meeting attached as Exhibit H.) Given these facts, consideration was given to delaying certain payments to vendors, although not without recognition of the "significant risk" such action posed to SVTC, Inc.'s and SVTC's ongoing operations. The AC also discussed how the DOE relationship could be negatively impacted, thereby risking the program continuation though years 2 and 3 (the confirmation of which was expected to be formalized during the upcoming "critical program year-end period") by possible actions, specific to SVTC Solar. Lastly, the AC highlighted the fact that payroll on September 5, 2012 represented a "critical date from a cash flow perspective" and that additional funding had to be in place by that time to avoid significant negative ramifications of low liquidity levels. Executive Management's strong expectation at this time was that funding would be secured via SVTC's existing and/or newly developed financing channels.

In addition, an extensive dialogue was held regarding the prepayment program wherein the AC was updated on communications with certain key customers. Specifically, it was noted that a term sheet was in process for ALG Solar and Morocco Solar Farm, with the likelihood of SVTC securing $600K and $800K, respectively; that prepayment discussions had been progressing as projected with Denso and Advantec, which was expected to yield $750K at the end of September 2012 from Denso, with a proposal of $2M scheduled to be discussed with Advantec on July 29, 2012; that the sales process was underway with Schlumberger, but it would not be booked in Q2FY '13; and that discussions with Semtech and Ion Torrent were on hold pending SVTC's progress on the other accounts.

As for other fundraising actions, the AC was advised that SVTC was still engaged in discussions with Sandisk regarding its proposed $1.5M prepayment, but awaiting feedback; that the Sematech prepayment terms remained in negotiations with closing targeted for the end of August 2012; that a meeting was planned with D-Wave Systems, Inc., a quantum computing company, for August 8, 2012, for the purpose of discussing a prepayment arrangement; and that the Suzhou investors had returned to the table indicating readiness to sign a deal related to setting up a development fab in Shanghai, China, that would bring $1M cash on the formation of a joint venture and $2M cash when the line became operational, with the earliest resolution of negotiations being November/December 2012.

Finally, it was noted that GCA Savvian's capital raising efforts were underway with meetings being scheduled with investors, that SVTC was in discussions with the Salter Group, a financial and strategic advisory firm, to have it augment GCA Savvian's capital raising efforts; and that discussions with Company A's Board were still ongoing with feedback expected the following week.

The financial outlook of SVTC essentially remained unchanged as of the final AC meeting held on August 7, 2012. (*See* presentation slides from the August 7, 2012 AC meeting attached as Exhibit I; *See also* Affidavit of Jack Sexton.) During that meeting, the AC discussed the plan to address the drop in revenue, the restructuring timeline for the fabs, updates on

MITCHELL SILBERBERG & KNUPP LLP

measures implemented to reserve cash and prepayments, as well as a review of options for the business going forward.

On August 11, 2012, Mr. Sexton forwarded an email to the Board advising them that the already extended liquidity situation had become progressively worse and had yet to fully offset through SVTC's restructuring/cost reduction actions. (See August 11, 2012 email from Mr. Sexton attached as Exhibit J; See also Affidavit of Jack Sexton.)  Moreover, he reported that "immediate actions" were underway to address the $600K liquidity shortfall projected to occur in early September 2012, particularly the sale of idle tools through 3rd party resellers and deferring certain solar equipment payments, as well as obtaining temporary credit increases, possibly from Wells Fargo or more likely "in-and-out" short term financing from existing investors, with the approval of Wells Fargo.  He also reported that long-term solutions were underway to address a $3M liquidity shortfall projected to occur in early December 2012, through the Customer Prepaying Program, the capital raising efforts of GCA Savvian and discussions with Wells Fargo regarding restructuring existing debt and replacing it with a combination of debt and credit financing which would increase available liquidity by $5M-$15M.

Thereafter, in Mr. Bruggeman's excerpt to the August 2012 Board of Managers and Executive Management Report, he advised that "[t]his quarter has been very challenging from a cash flow perspective," and as reflected by SVTC's receipt of "a very high (9) D&B rating." (See Mr. Bruggeman's excerpt to the Board report attached as Exhibit K.)  Moreover, Mr. Bruggeman reported that the volatile situation had manifested itself in the sales process, whereby new clients were "inquiring about [SVTC's] stability."  While Mr. Bruggeman stated that a plan to manage operations through September 2012 was in place, he added that it was "extremely tight."  Hence, in the short term, $4M in bridge financing was needed, coupled with $1M in customer pre-payments by end of September, to enable SVTC to work through the next quarter, while it finalized consolidation plans and the capital restructuring of the company, provided it did not receive a negative response from the DOE.  In the long-term, Mr. Bruggeman noted that SVTC had to consolidate its semiconductor operations, but that securing financing to do so was dependent upon certain collaborating and lending entities.

On August 30, 2012, a Board meeting was held wherein an overview was provided of the challenge SVTC faced from a cash flow perspective and the short-term plan to manage that challenge through September 2012. (See presentation slides from the August 30, 2012 Board meeting attached as Exhibit L; See also Affidavit of Jack Sexton.)  This overview included a discussion regarding the need for bridge financing, in the amount of $4M which, coupled with $1M in customer pre-payments received by the end of September and cash reimbursement continuation by the DOE, would have enabled SVTC to work through next quarter while it finalized consolidation plans and capital restructuring.  Moreover, the Board discussed the consolidation of SVTC's semiconductor operations with the redeployment of its operations and staff from San Jose, CA to Austin, Texas, resulting in the shutdown the San Jose Fab and creation of a concentrated Center of Excellence in Austin.  It was believed that this would improve the operational efficiency and capability of the semiconductor business.  However, the

MITCHELL SILBERBERG & KNUPP LLP

plan was to continue to build out the SVTC Solar Center of Excellence in San Jose, through the DOE contract.

2.    *GCA Savvian's Efforts to Raise Capital*

Following execution of the formal engagement letter by SVTC and GCA Savvian on July 27, 2012, to have GCA Savvian "act as [SVTC's] exclusive financial advisor in connection with a possible Offering or Strategic Transaction," and the establishment of a target customer list and an agreed upon list of potential investors, GCA Savvian immediately began having introductory communications with potential investors, by way of email and telephone, to advise them of the opportunity to invest in SVTC and gauge their interest in proceeding with more in depth communications. (*See* GCA Savvian's logs for SVTC-related communications from August 8, 2012, August 17, 2012 and September 5, 2012 attached as Exhibit M; *See also* Affidavit of Bryce Dakin.) These communications were typically accompanied by or followed up with a corporate overview presentation that summarized SVTC's operations, and the distribution of information regarding SVTC's financials, following a showing of continued interest and execution of a Non-Disclosure Agreement ("NDA"). (*See* SVTC's corporate presentation attached as Exhibit N). Important communications between GCA Savvian and potential investors were chronicled in a log which was updated and provided to SVTC periodically. (*See* Exhibit M; *See also* Affidavit of Bryce Dakin.)

For example, on August 2, 2012, GCA Savvian initiated communications with Company D, and Company E. Specifically, Mr. Dakin forwarded separate emails to the General Partner of Company D, and the Managing Director of Company E, advising of the opportunity to invest in SVTC and providing a corporate overview presentation. (*See* GCA Savvian's emails from and to Company D and Company E attached as Exhibit O and Exhibit P, respectively; *See also* Affidavit of Bryce Dakin.) This contact resulted in a follow up call with the General Partner of Company D on August 6, 2012 to review the materials provided and gauge Company D's interest in providing approximately $10-$15M in additional capital as proposed in his initial email. By August 8, 2012, Company D had signed an NDA and received SVTC's summary financials. A similar follow up telephone call was held with the Managing Director of Company E on August 10, 2012, after which SVTC's summary financials were forwarded to him for review as well.

Similarly, on August 3, 2012, Mr. Dakin forwarded introductory emails to the Managing Directors of Company F and Company G, respectively. (*See* Exhibit M; GCA Savvian's emails from and to Company G attached as Exhibit Q; *See also* Affidavit of Bryce Dakin.) In the case of Company F, a follow up call was held on August 10, 2012, wherein Company F's interest triggered the issuance of an NDA, a signed copy of which Ms. Dakin was awaiting receipt as of August 17, 2012.

In the case of Company G, on August 6, 2012, Mr. Dakin and Shingo Yatsui, GCA Savvian's Vice President, had a telephone call with the Managing Partner of Company G to review the corporate overview presentation materials, which resulted in Company G's execution

MITCHELL SILBERBERG & KNUPP LLP

The Honorable Christine Baker
October 31, 2012
Page 10

of an NDA.  Thereafter, ongoing communications took place with Company G, including a diligence call between SVTC's management and Company G on August 7, 2012, and a follow up call between GCA Savvian and Company G, on August 16, 2012, which culminated in GCA Savvian's August 17, 2012 receipt of an email from Company G's Associate, setting forth preliminary financing terms being offered to SVTC by Company G, in the form of a 4-year, $27M secured loan.  Those terms were further elaborated upon in a September 4, 2012 email from the Managing Partner of Company G to Mr. Dakin.  However, a follow up call was held on September 6, 2012, between GCA Savvian and Company G representatives, wherein SVTC's decision to decline Company G's proposal was conveyed on the grounds that SVTC believed that it "[fell] short of providing a long-term and stable path forward for SVTC."  Yet, as of September 18, 2012, GCA Savvian and Company G representatives were still engaged in a dialogue regarding financing with Mr. Dakin having presented the Managing Partner of Company G with a proposal regarding sources for new equity with the hope of generating Company G's renewed interest.

On August 3, 2012, Mr. Dakin also had introductory telephone calls with the Managing Director of Company H, which led to follow-up discussions.  (*See* Exhibit M; *See also* Affidavit of Bryce Dakin.)  Moreover, GCA Savvian reached out, with overview materials, to Companies I through S.  This initial contact led to a additional communications wherein the companies either sought additional information, advised of the need to consider the opportunity internally or expressed a lack of interest.  (*See* Exhibit M.)

On August 13, 2012, GCA Savvian initiated communications with Company T.  (*See* GCA Savvian's emails to and from Company T attached as Exhibit R.)  Specifically, Mr. Dakin forward SVTC's corporate overview presentation to Company T's Partner and Co-founder.  On August 16, 2012, SVTC's management had a diligence call with Company T's Investment Professional.  Thereafter, on August 31, 2012, GCA Savvian forwarded additional financial information to Company T which was followed by calls with Company T's representatives, on September 5, 2012, requesting further information on SVTC's assets, and again on September 20, 2012, wherein Company T's continued interest in providing financial assistance was conveyed, coupled with a request for further feedback regarding SVTC's assets.

On August 15, 2012, GCA Savvian received notification from the Vice President of Company U, with whom he had initiated discussions on August 13, 2012, that Company U was declining the opportunity to invest in SVTC due to its low EBITDA and lack of immediate cash flows.  However, in so doing, Vice President of Company U referred GCA Savvian to Company V.

On August 17, 2012, Mr. Dakin and Mr. Yatsui followed up on the referral and spoke with a Senior Associate at Company V who, in turn, introduced Mr. Dakin to the Vice President of Company W, on August 20, 2012, for the purpose of having Company W partner with Company V on any potential deal.  (*See* GCA Savvian's emails to and from Company V and Company W attached as Exhibit S.)  Thereafter, continued communications with Company V

The Honorable Christine Baker
October 31, 2012
Page 11

and Company W, resulted in GCA Savvian's production of additional information regarding SVTC, including more detailed financial data to them on August 31, 2012.

On August 23, 2012, following communications between GCA Savvian and Company X, an NDA and SVTC financial summary were forwarded to Company X's President.  (*See* GCA Savvian's emails to and from Company X attached as Exhibit T.)  In addition, a discussion was held regarding the scheduling of an in-person diligence meeting at SVTC's San Jose facility during a planned visit to California, the week of August 27, 2012, by Company X's President.

On August 30, 2012, GCA Savvian contacted Company Y to discuss the SVTC opportunity, which resulted in a follow-up call on September 5, 2012, between Mr. Dakin and Company Y's Partner.  (*See* GCA Savvian's emails to and from Company Y attached as Exhibit U.)  Thereafter, GCA Savvian reached out to Company Y to coordinate an on-site diligence session with SVTC management, which was held on September 13, 2012, after which supplemental financial information was sent to Company Y.

On September 5, 2012, following a discussion between Mr. Dakin and a Company Z Partner regarding SVTC, GCA Savvian forward an NDA to the Partner to continue the exchange of SVTC information.  (*See* GCA Savvian's emails to and from AIP attached as Exhibit V.)

As indicated above, by mid-September 2012, the two main entities with whom GCA Savvian was still engaged in communications, as part of its capital raising efforts on behalf of SVTC, were Company G and Company Y.  (*See* Affidavit of Bryce Dakin.)  Company G, from whom GCA Savvian had received 2 preliminary proposals of interest, which had both been rejected by SVTC, continued discussions with GCA Savvian in pursuit of an alternative arrangement.  Similarly, Company Y, who provided GCA Savvian with notification, on September 17, 2012, of its intention to formally pass on any investment opportunity, continued to engage in discussions regarding potential investment/acquisition options under a revised transaction structure.

However, following GCA Savvian's receipt of notification that the Board of Directors of SVTC had voted, during its September 20, 2012 meeting, to cease operations, it communicated this information to both Company G and Company Y, which essentially ended continued consideration of any investment opportunity by these and other entities.  (*See* Affidavit of Bryce Dakin.).  As a result, GCA Savvian did not raise any capital to address SVTC's liquidity issues.

C.      **THE SEPTEMBER TERMINATION**

1.      **The Two Layoffs**

There were two layoffs implemented in September 2012 in San Jose.  One on September 12, 2012, involving approximately 30 employees, and one on September 28, 2012, involving 106 employees.

MITCHELL SILBERBERG & KNUPP LLP

The Honorable Christine Baker
October 31, 2012
Page 12

The first layoff was a result of further cost cutting measures implemented by SVTC's Management, with full approval of the Board, to reduce approximately 30 positions in San Jose, that were determined to be not essential to continuing operations.

Following the September 12, 2012 layoffs, SVTC issued a WARN notice, dated September 18, 2012, advising employees of its intent "to close all or part of the San Jose facility between November 17 and December 1, 2012," which would result in additional terminations during that time period. (*See* September 18, 2012 WARN notice attached as Exhibit W.)

However, on September 20, 2012, the Board conducted a critical review of SVTC's business and liquidity, which resulted in a determination that while SVTC had received $3.1M in customer prepayments, it was not sufficient and that sufficient capital had not been raised and was not likely to be raised to ensure continued operations in San Jose. (*See* Affidavits of Jack Sexton.). Consequently, it was concluded that it was the best interest of SVTC's stakeholders to proceed with an orderly liquidation of the business. Accordingly, on September 26, 2012, SVTC issued a second WARN notice advising employees that while it had been originally anticipated that the San Jose facility would not be closed until sometime between November 17 and December 1, 2012, it would be closing on September 28, 2012, which would, in turn, impact their continued employment. (*See* September 26, 2012 WARN notice attached as Exhibit X.) Thereafter, 106 employees were terminated on September 28, 2012.

With the second layoff, only a handful of employees remained to wind down the affairs of the San Jose operation, and to keep the enormously expensive tools and clean room safe. As of the writing of this letter, the timing of the final shutdown is unknown.

## 2. The Layoffs were Part of a "Termination" within the Meaning of Cal-WARN.

Because there were more than 75 employees employed by SVTC during the twelve months preceding, SVTC's San Jose facility is considered a "covered establishment," as defined by Cal-WARN. (*See* Labor Code § 1400(a)). As an employer of a "covered establishment," SVTC was required, under normal circumstances, to give 60 days' notice prior to the effective date of any order for a mass layoff, relocation, or termination at the San Jose facility. (*See* Labor Code § 1401(a)).

As a threshold matter, the September 2012 layoffs were not a mass layoff or relocation, but rather a "termination" within the meaning of Cal-WARN. Section 1400(f) defines termination as "the cessation or substantial cessation of industrial or commercial operations in a covered establishment." This definition is clearly applicable to SVTC in that while its San Jose facility presently remains open, as of September 28, 2012, the date of the second layoff, the company ceased operations at that location. Since that time, a skeletal workforce has remained in place to safeguard the expensive tools and clean room and assist with the full closure of the facility on a date yet to be determined. Given these facts, Section 1402.5(d), which pertains to notice of a mass layoff, is not applicable.

MITCHELL SILBERBERG & KNUPP LLP

## II.    THE ACTIVELY SEEKING CAPITAL OR BUSINESS EXCEPTION UNDER SECTION 1402.5

Section 1402.5 sets forth an exception to the employee notification requirement and provides in full:

(a)    An employer is not required to comply with the notice requirement contained in subdivision (a) of Section 1401 if the department determines that all of the following conditions exist:

    (1)    As of the time that notice would have been required, the employer was actively seeking capital or business.

    (2)    The capital or business sought, if obtained, would have enabled the employer to avoid or postpone the relocation or termination.

    (3)    The employer reasonably and in good faith believed that giving the notice required by subdivision (a) of Section 1401 would have precluded the employer from obtaining the needed capital or business.

(b)    The department may not determine that the employer was actively seeking capital or business under subdivision (a) unless the employer provides the department with both of the following:

    (1)    A written record consisting of all documents relevant to the determination of whether the employer was actively seeking capital or business, as specified by the department.

    (2)    An affidavit verifying the contents of the documents contained in the record.

(c)    The affidavit provided to the department pursuant to paragraph (2) of subdivision (b) shall contain a declaration signed under penalty of perjury stating that the affidavit and the contents of the documents contained in the record submitted pursuant to paragraph (1) of subdivision (b) are true and correct.

### A.    ACTIVELY SEEKING CAPITAL OR BUSINESS

Section 1402.5(a)(1) requires that the employer must have been actively seeking capital or business as of the time notice "would have been required," which is at least 60 days prior to the effective date of any mass layoff, relocation, or termination.  (*See* Labor Code § 1401(a)).  Here, SVTC terminated 35 employees on September 12, 2012, and 106 employees on September 28, 2012.  Thus, notice under normal circumstances would have been required as of July 14, 2012, and July 30, 2012, respectively, which is 60 days prior to the effective date of each layoff.

MITCHELL SILBERBERG & KNUPP LLP

The Honorable Christine Baker
October 31, 2012
Page 14

In this instance, however, notice was not provided as required because SVTC was "actively seeking capital or business" during the relevant periods.

### 1.    Active Discussions as of the July 14, 2012 Notice Date

SVTC has presented clear evidence of having satisfied this requirement with respect to the required notice date of July 14, 2012.

First, as part of the development of its Customer Prepayment Program, which was designed for the specific purpose of enabling SVTC to raise an estimated $4M-6M in short term growth capital, Mr. Hamma and Mr. Bruggeman began, what became, ongoing communications with two customers, Denso and Advantec, regarding the possibility of them making a prepayment. These communications occurred during the creation of the Customer Payment Program, which they, along with Mr. Sexton, began developing on or about July 3, 2012, and were discussed during the July 17, 2012 Board meeting, at which time the program received formal approval. (*See* Exhibit B; *See also* Affidavit of Jack Sexton.). Thereafter, they continued until early September 2012, resulting in SVTC's receipt of a $750,000 commitment from Denso, which it ultimately elected not to accept following the decision to close the San Jose facility, and no prepayment or commitment from Advantec as of the closure decision.

Second, on June 29, 2012, Mr. Bruggeman began discussions with Company A, for the purpose of raising capital for SVTC. Specifically, he sought to obtain Company A's interest in a merger with all or part of SVTC's business, a contribution of capital to SVTC, the purchase of specific SVTC inventory or some alternative option. That initial dialogue resulted in a follow-up meeting between SVTC and Company A representatives on July 13, 2012, wherein the parties engaged in more detailed discussions around the potential customer, capability and financial benefits that could result from such a relationship. At the conclusion of that meeting it was understood that Company A would be discussing its options internally and get back to SVTC the following week. (*See* Exhibit C.) As of August 2012, SVTC and Company A were still engaged in discussions regarding a potential arrangement.

Third, as reported to the Board on July 17, 2012, SVTC Solar had engaged in discussions with Company B and Company C during the week of July 9, 2012, to ascertain whether these entities had an interest in buying equity in SVTC Solar. (*See* Exhibit D; *See also* Affidavit of Jack Sexton.)

### 2.    Active Discussions as of the July 30, 2012 Notice Date

Similarly, the prerequisite is met with regard to the July 30, 2012 required notice date.

In addition to the communications noted above that remained ongoing through July 30, 2012, as of this date not only had the Customer Prepayment Program been formally approved by the Board and implemented, but SVTC had already identified and been actively engaged in discussions with 9 of its customers for the purpose of having them make prepayments. (*See*

MITCHELL SILBERBERG & KNUPP LLP

The Honorable Christine Baker
October 31, 2012
Page 15

Exhibit F.)  Moreover, by the time of the first AC meeting, on July 27, 2012, SVTC had, apart from these 9 customers, commenced discussions with its largest customer, Sandisk, regarding making a $1.5M prepayment, which were ongoing through August 2012.  In addition, it had also resumed talks with Sematech regarding receipt of a prepayment, which it estimated would close on by the end of August 2012.  Ultimately, these communications resulted in SVTC's receipt of prepayments totaling $3.1M.

Second, SVTC was actively seeking capital or business by way of its relationship with GCA Savvian, with whom it initiated discussions on or about June 27, 2012, for the purpose of acquiring assistance in evaluating potential strategic combinations, as well as raising capital. (*See* Exhibit A; *See also* Affidavits of Jack Sexton and Bryce Dakin.)  The discussions were ongoing through July 27, 2012, when the parties executed a formal engagement letter and standard indemnification letter.  In fact, prior to its formal engagement, GCA Savvian assisted SVTC representative with their strategic approach to, and preparation of a presentation for, the July 13, 2012 meeting with Company A representatives.  (*See* Affidavit of Bryce Dakin.) However, when it became apparent that SVTC and Company A were not likely to be moving forward with a transaction, GCA Savvian began having discussions with SVTC and its investors regarding an action plan for targeting new capital.  Thereafter, GCA Savvian and SVTC, were both actively seeking capital and business, independently and collectively, through the termination dates of September 12, 2012 and September 28, 2012, which if, obtained, would have enabled the company to avoid or postpone the shutdown and subsequent sale that has since occurred.

Section 1402.5 is modeled in substantial part upon the "faltering company" exception set forth in the federal Warn Act, which provides:

> An employer may order the shutdown of a single site of employment before the conclusion of the 60-day period if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business.

29 U.S.C. § 2102(b)(1).  When California laws are patterned after federal statutes, federal decisions interpreting the federal provisions are persuasive authority.  *See Alcala v. Western Ag Enterprises* 182 Cal. App. 3d 546, 550 (1986).  Regulations promulgated by the federal Department of Labor to interpret and implement the federal Warn Act provide that an employer seeking to qualify for the faltering company exception must demonstrate that the following four conditions are satisfied:

> (1)     the employer was actively seeking capital or business at the time the notice would have been required;

MITCHELL SILBERBERG & KNUPP LLP

The Honorable Christine Baker
October 31, 2012
Page 16

(2)      there was a realistic opportunity to obtain the financing or business sought;[2]

(3)      the financing or business sought would have been sufficient, if obtained, to keep the business open for a reasonable period of time; and

(4)      the employer reasonably and in good faith believed that giving the required notice would have precluded the employer from obtaining the needed capital or business.

20 C.F.R. § 639.9(a).  20 C.F.R. § 639.9 provides at subsection (a)(1):

the employer must have been seeking financing or refinancing through the arrangement of loans, the issuance of stocks, bonds, or other methods of internally generated financing; or the employer must have been seeking additional money, credit, or business through any other commercially reasonable method.  The employer must be able to identify specific actions taken to obtain capital or business.

The supporting documents and testimony provided by SVTC amply corroborate its contention that it was "actively seeking capital or business" within the meaning of Section 1402.5(a)(1), as of July 14, 2012 and July 30, 2012.  Accordingly, the requirements of Section 1402.5(a) have been met by SVTC.

**B.     CAPITAL OR BUSINESS SOUGHT MUST HAVE ENABLED EMPLOYER TO AVOID OR POSTPONE TERMINATION**

Section 1402.5(a)(2) requires that the employer must show that the capital or business sought, if obtained, would have enabled the employer to avoid or postpone the relocation or termination.  The federal regulations provide that "The employer must be able to objectively demonstrate that the amount of capital or the volume of new business sought would have enabled the employer to keep the facility, operating unit, or site open for a reasonable period of time." *(See* 20 C.F.R. § 639.9(a)(3)).

Here, the supporting documents demonstrate that had the necessary capital from potential investors been obtained, the September 2012 layoffs could have been avoided, if not postposed. In this regard, the first layoff on September 12, 2012 was a cost cutting measure intended to enable SVTC to continue its operations by eliminating non-essential positions, and continue its capital raising efforts.  By the time of the second layoff, SVTC had received formal notification from Company Y, on September 17, 2012, of its intent to pass on any investment opportunity. The following day, September 18, 2012, SVTC issued a WARN notice advising of its intent "to close all or part of the San Jose facility between November 17 and December 1, 2012," which would result in employee terminations.  *(See* Exhibit W).  Thereafter, during the September 20, 2012 meeting, the Board determined that while SVTC had received $3.1M in customer prepayments to alleviate SVTC's liquidity constraints through December 2012, it was not

---

[2] This element, that the financing or business opportunities being sought must have been realistic, is nowhere to be found in Section 1402.5.

The Honorable Christine Baker
October 31, 2012
Page 17

sufficient and that sufficient capital had not and was not likely to be raised to ensure continued operations in San Jose. (*See* Exhibit Y; Affidavit of Jack Sexton.). As such, it was in the found to be in the best interest of SVTC's investors "to proceed with an orderly liquidation of the business" and a second WARN notice was sent to employees, on September 26, 2012, advising of the impending facility closure and their terminations, effective September 28, 2012. (*See* Exhibit Y; Affidavit of Jack Sexton.).

This contention is also corroborated by the testimony of Mr. Sexton, who stated that had SVTC been able to raise the $15M in capital that it was seeking by September 17, 2012, these funds would likely have been sufficient to avoid these employment losses. His opinion is based on the long term revenue and cash flow projections. Moreover, it is his belief that the dip in revenue which SVTC experienced, beginning in late July 2012, was temporary in nature and that it would have returned to growth by March of 2013. (*See* Affidavit of Jack Sexton.).

Based on the foregoing, SVTC has presented sufficient facts indicating that if the capital sought, had been obtained, it would have been able to postpone the terminations of the affected workers for a reasonable period of time.

### C.   REASONABLE AND GOOD FAITH BELIEF THAT GIVING NOTICE WOULD PRECLUDE EMPLOYER FROM OBTAINING CAPITAL OR BUSINESS

Finally, the employer must have a reasonable and good faith belief that giving the notice would have precluded the employer from obtaining the needed capital or business. (*See* Section 1402.5(a)(3).) 20 C.F.R. § 639.9(a)(4) provides in part:

> The employer must be able to objectively demonstrate that it reasonably thought that a potential customer or source of financing would have been unwilling to provide the new business or capital if notice were given, that is, if the employees, customers, or the public were aware that the facility, operating unit, or site might have to close. *This condition may be satisfied if the employer can show that the financing or business source would not choose to do business with a troubled company or with a company whose workforce would be looking for other jobs.*

(emphasis added.)

As discussed above, the evidence submitted indicates that at the time notice was required, on July 14, 2012 and July 30, 2012, SVTC was actively seeking capital or business within the meaning of Section 1402.5(a)(1) or the similar federal exception.

The documents and testimony submitted also sufficiently establish that providing notice would likely have precluded SVTC from maintaining its existing customers and securing capital from potential investors. This is corroborated by the fact that, on or about August 30, 2012, prior to the issuance of any WARN notices, Mr. Bruggeman reported to the Board that concerns over SVTC's volatility had manifested in the sales process wherein new clients were "inquiring about [SVTC's] stability." (*See* Exhibit K.)

MITCHELL SILBERBERG & KNUPP LLP

The Honorable Christine Baker
October 31, 2012
Page 18

Moreover, Mr. Sexton, has stated that, in his opinion, any notice of layoffs or closure by SVTC while it was in the process of seeking capital would have proven detrimental not only to SVTC's ability to obtain such capital, but also to SVTC Solar's operations. (*See* Affidavit of Jack Sexton.) Mr. Sexton reasoned that SVTC Solar is a "developmental fab" that was created using SVTC's business model for the semiconductor industry. As such, any suggestion that the semiconductor developmental fab model was struggling to the point of closing key operations would likely have raised concerns amongst potential investors as to the stability and long term viability of the solar developmental fab model and, in turn, have impacted their willingness to invest. Mr. Dakin stated that knowing what he knows about WARN notices, it is not surprising to him that SVTC's issuance of the WARN notice led to customers pulling equipment from the San Jose facility and significant disruptions in operations. He added that in his view, in hindsight, the issuance of the WARN notice that did go out was a significant factor in ending discussions with potential investors. Furthermore, he reported that, in his opinion, had SVTC done a WARN notice earlier than when it did, the ability to have engaged in any substantive investor discussions would have been significantly negatively impacted (*See* Affidavit of Bryce Dakin.)

In addition to the opinions of Mr. Sexton and Mr. Dakin, the events that followed the issuance of the September 18, 2012 Warn Notice provide ample evidence that the ability to obtain capital or business would have been negatively impacted by an earlier issuance of the notice. Specifically, the San Jose fab experienced chaotic disruptions by customers who received notification of employee terminations and filings of WARN letters with the state authorities. (*See* email communications referencing customer responses to the September 18, 2012 Warn Notice attached as Exhibit X.) Many existing customers began arriving to the facility looking to retrieve their property. Those customers that were delayed or denied access to the fab demanded that their property be provided to them immediately. One customer even advised that he would pull the fire alarm if he had to in order to retrieve his belongings. As a result of this conduct, SVTC was forced to cease access to the fab, retain additional security and institute protocol for customers entering and exiting the fab. In addition, SVTC received requests from several military customers for "an official notice of liquidation" so that they could notify their government customers and implement changes to program contracts. SVTC also began receiving demands from some customers to have access to CEO and Board level audiences to voice their discontentment with the situation.

The above-described customer conduct fully demonstrates that SVTC had a reasonable and good faith belief, as required under Section 1402.5(a)(3), that providing notice would have precluded it from obtaining capital or business.

MITCHELL SILBERBERG & KNUPP LLP

The Honorable Christine Baker
October 31, 2012
Page 19

III.     **CONCLUSION**

For the foregoing reasons and under the facts presented here, SVTC has clearly met the requirements under Section 1402.5.  It is therefore entitled to an exemption from the employee notice requirements contained in Section 1401 of Cal-WARN.


Very truly yours,


S/ Steven M. Schneider (GTH)

Steven M. Schneider
Mitchell Silberberg & Knupp LLP
11377 W. Olympic Blvd.
Los Angeles, CA 90064
Phone: (310) 312-3128
Fax: (310) 231-8328
sms@msk.com

Gerald T. Hathaway
Mitchell Silberberg & Knupp LLP
12 East 49th Street, 30th Floor
New York, NY 10017
Phone: (917) 546-7706
Fax: (917) 546-7676
gth@msk.com


GTH/qjc

4940008.1/00121-00052

Exhibit 3

STATE OF CALIFORNIA                          Arnold Schwarzenegger, *Governor*

DEPARTMENT OF INDUSTRIAL RELATIONS
Office of the Director
455 Golden Gate Avenue, 10th Floor
San Francisco, CA  94102
(415) 703-4240



April 3, 2006

<u>Via Facsimile to (925) 932-1961
    And Via US Mail</u>

Mr. Stephen Davenport
Davenport Gerstner & McClure
1990 North California Boulevard, Ste. 650
Walnut Creek CA  94596

Re:   <u>Request for Exemption Under
      Labor Code §1402.5 (Cal-WARN Act)
      Employer: Anderson Truss</u>

Dear Mr. Davenport,

     This constitutes the determination of the Director of
Industrial Relations regarding the applicability of Labor Code
§1402.5[1] to the closure of the Dixon plant of the Anderson Truss
Company ("Company").  Based on my review of the facts of this case
and an analysis of the applicable law, it is my determination that
the Company meets the requirements of section 1402.5 and therefore
is excused from providing its affected employees with the 60-day
notice required by section 1401(a).

<u>Summary of Facts</u>

     The Company manufactures roof and floor trusses, which are
installed in new homes to support roofs and floors.  Company
maintains three plants, in Dixon, in Lathrop, and in Marysville,
California.  Only the Dixon plant is the subject of this
Determination.  Three of Company's largest clients are Beazer
Homes, D.R. Horton and JMC Homes, each of whom is a national
company in the business of building new homes.

     Since November, 2005, the Company has operated the Dixon plant
at reduced staffing levels due to a seasonal decrease in new home
building and consequent decreased demand in the industry for
trusses.  At that time, the Company implemented a work-sharing plan
with the Employment Development Department (EDD), which allows
employees to work less than full time while receiving supplemental

---

[1]  All statutory references herein are to the Labor Code, unless otherwise
indicated.

Letter to Mr. Davenport
Re: Labor Code §1402.5
Page 2


unemployment benefits from EDD. The Dixon plant employs
approximately 90 people.

In December, 2005, Company received projections from Beazer
Homes, D.R. Horton and JMC Homes, stating that they planned to
build a total of 3,866 new homes in Northern California, for which
Company would supply the trusses. Thus, at that time, Company
expected plant operation to return to normal levels.

As of February 21, 2006, Beazer Homes, D.R. Horton and JMC
Homes had all advised Company that they would be building, on
average, 36% fewer homes than had been expected in December.
Accordingly, they would be requiring 36% fewer trusses from Company
than had been expected. This reduction is consistent with
decreases experienced by other businesses in the building industry.

Due to the downturn in business, Company intends to close the
Dixon plant as soon as possible. An administration office located
at the site will remain open and continue to administer the two
remaining plants, but the truss production operations which
comprise the Dixon plant will completely close.

The Company believes that to announce the plant closure any
sooner would have caused its large customers to place their truss
orders with other competitors. In order to attract business of
large home builders, the Company needs to be able to show them that
it has the plant capacity and workforce necessary to fill orders in
a timely fashion. Announcing a plant closure would have driven
away business the Company needed and expected to get.

The Company would like to close down the Dixon plant
immediately, or by early April. It is requesting an exemption from
section 1401, which requires the Company to give its workers notice
60 days in advance of the closure, which would have been early
February.

## Analysis

Section 1400 *et seq* (known as the "Cal-WARN Act") provides, in
pertinent part, that prior to closure of a "covered establishment,"
an employer must give its employees sixty days' notice of the
pending closure. Section 1401(a) defines a "covered establishment"
as "any industrial or commercial facility or part thereof that
employs, or has employed within the preceding 12 months, 75 or more
persons." Section 1400 (a) An "employer" is any person who owns
and operates a covered establishment. Section 1400 (b). The Dixon
plant at issue here is a covered establishment because it employed

Letter to Mr. Davenport
Re: Labor Code §1402.5
Page 3

approximately 90 people during the past twelve months.   Anderson
Truss owns and operates the Dixon plant and therefore is an
employer within the meaning of the Act.   As such, it is required to
give its employees 60 days notice of the plant closure, unless it
is excused from the notice requirement.

Section 1402.5 (known as the "faltering company exception")
provides as follows:

> (a) An employer is not required to comply with the notice
> requirement contained in subdivision (a) of Section 1401 if
> the department determines that all of the following conditions
> exist:
> (1) As of the time that notice would have been required, the
> employer was actively seeking capital or business.
> (2) The capital or business sought, if obtained, would have
> enabled the employer to avoid or postpone the relocation or
> termination.
> (3) The employer reasonably and in good faith believed that
> giving the notice required by subdivision (a) of Section 1401
> would have precluded the employer from obtaining the needed
> capital or business. … ·
>
> … d) This section does not apply to notice of a mass layoff as
> defined by subdivision (d) of Section 1400.

As a threshold matter, the closure of the Dixon plant is not a
mass layoff but rather is a termination as defined by Section 1400
(f) : "the cessation or substantial cessation of industrial or
commercial operations in a  covered establishment."   Therefore,
Section 1402.5(d) is inapplicable.

If the plant is to be closed in early April, then the "time
that the notice would have been required" was early February.   As
of that time, the Company was actively seeking business from its
three main clients.   It had received projections from its clients
indicating that demand for trusses would increase in the coming
months, and it had maintained its workforce with the expectation
that this business was forthcoming.   Thus, the first element of
Section 1402.5 is met.

The second element is also met. Had the company received the
number of orders for trusses that it had anticipated, there would
be no need for it to close the plant.

Finally, the third element is met because the employer
reasonably believed that giving the notice would have caused its
clients to take their business elsewhere.   The Company

Letter to Mr. Davenport
Re: Labor Code §1402.5
Page 4


understandably did not want to raise doubts that it would be unable
to handle the business its clients had promised to bring.

For the foregoing reasons, under the facts presented here, the
Company is excused from the 60-day notice requirement pursuant to
section 1402.5(a).


Sincerely,

John Rea
Acting Director

STATE OF CALIFORNIA                                                                      Arnold Schwarzenegger, *Governor*

DEPARTMENT OF INDUSTRIAL RELATIONS
OFFICE OF THE DIRECTOR
455 Golden Gate Avenue, Tenth Floor
San Francisco, CA 94102
(415) 703-5050



July 27, 2010

Phil Siegel
C.F.O. and Interim C.E.O.
Telscape Communications, Inc.
606 East Huntington Drive
Monrovia, CA 91016

**Re:    Request For Exception Under Labor Code § 1402.5 (Cal-WARN Act)
         Employer: Telscape Communications, Inc.**

Dear Mr. Siegel:

This letter is in response to Telscape Communications, Inc.'s ("Telscape") March 19, 2010, supplemental submission to the Department of Industrial Relations ("Department") regarding its request for exception under California Labor Code § 1402.5 of the Worker Adjustment and Retraining Notification Act ("Cal-WARN Act") .[1]  Telscape failed to give the notice to its employees provided in Labor Code § 1401(a) when it ceased substantially all of its Wireline Service sales operations, resulting in the termination of 159 employees on December 12, 2008.  Telscape claims it is exempt from the notice requirements on the basis that it was an employer actively seeking capital or business at the time notice would have been required as set forth in Section 1402.5.

Based upon a review of the further submissions by Telscape and the applicable law, the Director finds that Telscape satisfies the requirements of Section 1402.5 and therefore, is excused from providing its affected employees with the 60-day notice required by Section 1401(a).  This letter is the Director's final Determination and supersedes the March 4, 2010, Determination in this matter.

## I.    FACTUAL BACKGROUND

Telscape submitted to the Office of the Director and to the Labor Commissioner your letter dated January 16, 2009, signed under penalty of perjury, alleging that Telscape ceased substantially all of its Wireline Service sales operations and terminated 159 employees on December 12, 2008.  Attached as Exhibit "A" to the January 16, 2009, letter is a letter dated December 12, 2008, addressed to the State Employment Development Department and local officials purporting to give notice under the Cal-WARN Act.  The December 12, 2008, letter states that Telscape will be ceasing substantially all of its Wireline Service sales operations effective that same date.  The January 16, 2009, letter states that "notice was shortened based on the Company's reasonable good faith belief that providing prior notice would have prevented the Company from securing the business and capital it was actively seeking and which was necessary to avoid the termination of the Wireline Service sales operations."  Telscape also asserts in the

---

[1]  All statutory section references are to the California Labor Code unless otherwise indicated.

Letter to Phil Siegel
Re: Request For Exception Under Labor Code § 1402.5 (Cal-WARN Act)
Page 2

January 16, 2009, letter that it retained the services of an investment banker and took other steps to secure funds for the Company and reasonably believed its efforts would prove successful, only learning in the week prior to December 12, 2008, that its efforts had failed.

Attached to the January 16, 2009, letter as Exhibit "B" is an engagement agreement dated October 24, 2008, between Houlihan Lokey and Telscape whereby Houlihan Lokey was to provide financial, advisory, and investment banking services "in connection with the possible merger, consolidation, joint venture, partnership, spin-off, business combination, tender or exchange offer, acquisition, sale, transfer or other disposition of assets or equity interests or similar transactions, involving all or a substantial portion of the business, assets or equity interests of the Company and/or any of its subsidiaries or affiliates, in one or more related transactions." The engagement agreement also provides that "Houlihan Lokey's services will exclusively consist of assisting the Company in the following: (a) drafting a bid procedure letter to be delivered to potential acquirors of the Company, (b) reviewing and providing feedback to the management presentation, as prepared by the Company, to be delivered to potential acquirors, (c) organizing an online data room, (d) evaluating letters of intent regarding a Transaction, (e) selecting an acquirer of the Company based on such letters of intent, and (f) negotiation of the purchase agreement and other financial aspects in order to consummate a Transaction." (*See* page 1, paragraph 1 of the October 24, 2008 engagement agreement.)

On March 13, 2009, (erroneously dated 2008) in response to a request for information from the Labor Commissioner's Office, Telscape provided its Balance Sheet dated December 31, 2008, a "Financial Flash" dated December 31, 2008, and portions of Financial Statements as of December 31, 2007 (pages 11 and 15 are missing). Telscape indicates in its March 13, 2009, letter that the financial statements show significant losses incurred in 2008. Telscape also attached bank and credit arrangement documents Telscape states reveal outstanding loans.

On March 19, 2010, in response to the Department's March 4, 2010, letter, Telscape submitted supplemental materials consisting of the Affidavit of Philip Siegel, Telscape's CFO, Declaration of Bill Nietschmann, Senior VP of East West Bank, Telscape's primary lender, Declaration of Nathan Johnson, Partner and Principal with Gemini Partners, Inc., and Greg McPherson, Chief Operating Officer with Westrec Capital Partners, LLC.

## II.     THE ACTIVELY SEEKING CAPITAL OR BUSINESS EXCEPTION UNDER SECTION 1402.5

The notice requirement exception contained in Section 1402.5 provides:

(a)     An employer is not required to comply with the notice requirement contained in subdivision (a) of Section 1401 if the department determines that all of the following conditions exist:

(1)     As of the time that notice would have been required, the employer was actively seeking capital or business.

Letter to Phil Siegel
Re: Request For Exception Under Labor Code § 1402.5 (Cal-WARN Act)
Page 3

(2)    The capital or business sought, if obtained, would have enabled the employer to avoid or postpone the relocation or termination.

(3)    The employer reasonably and in good faith believed that giving the notice required by subdivision (a) of Section 1401 would have precluded the employer from obtaining the needed capital or business.

(b)    The Department may not determine that the employer was actively seeking capital or business under subdivision (a) unless the employer provides the Department with both of the following:

(1)    A written record consisting of all documents relevant to the determination of whether the employer was actively seeking capital or business, as specified by the Department.

(2)    An affidavit verifying the contents of the documents contained in the record.

(c)    The affidavit provided to the Department pursuant to paragraph (2) of subdivision (b) shall contain a declaration signed under penalty of perjury stating that the affidavit and the contents of the documents contained in the record submitted pursuant to paragraph (1) of subdivision (b) are true and correct.

Section 1402.5 is modeled in substantial part, upon the "faltering company" exception set forth in the federal Worker Adjustment and Retraining Notification Act ("Warn Act"), which provides:

An employer may order the shutdown of a single site of employment before the conclusion of the 60-day period if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business.

(*See* 29 U.S.C. § 2102(b)(1).)  While federal law is not binding on California courts, "when California laws are patterned after federal statutes, federal decisions interpreting the federal provisions are persuasive authority."  (*See Alcala v. Western Ag Enterprises* (1986) 182 Cal. App. 3d 546, 550.)  Regulations promulgated by the United States Department of Labor to interpret and implement the federal Warn Act provide that an employer seeking to qualify for the faltering company exception must demonstrate that the following four conditions are satisfied:

Letter to Phil Siegel
Re: Request For Exception Under Labor Code § 1402.5 (Cal-WARN Act)
Page 4

 (1)  the employer was actively seeking capital or business at the time the notice would have been required;

 (2)  there was a realistic opportunity to obtain the financing or business sought;

 (3)  the financing or business sought would have been sufficient, if obtained, to keep the business open for a reasonable period of time; and

 (4)  the employer reasonably and in good faith believed that giving the required notice would have precluded the employer from obtaining the needed capital or business.

(*See* 20 C.F.R. § 639.9(a).) 20 C.F.R. § 639.9 provides at subsection (a)(1) that "the employer must have been seeking financing or refinancing through the arrangement of loans, the issuance of stocks, bonds, or other methods of internally generated financing; or the employer must have been seeking additional money, credit, or business through any other commercially reasonable method. The employer must be able to identify specific actions taken to obtain capital or business."

### A.  <u>Actively Seeking Capital Or Business (Section 1402.5(a)(1))</u>

 Section 1402.5(a)(1) requires that the employer must have been actively seeking capital or business as of the time notice "would have been required," which is at least 60 days prior to the effective date of any mass layoff, relocation, or termination.

 Here, Telscape ceased its Wireline Service sales operations and terminated the affected workers on December 12, 2008. Thus, notice was required as of October 13, 2008. Telscape's main shareholder, Gemini Partners lists several investors that it contacted in seeking capital. Telscape submits information from one of the potential investors, Granite Creek Capital ("Granite Creek"). At least as of October 13, 2008, the date that Telscape was required to give notice, it was communicating with Granite Creek regarding a capital investment of approximately $6 million dollars. Moreover, the Declaration of Bill Nietschmann, Senior Vice President of East West Bank suggests that Telscape was actively attempting to recapitalize the company which prompted East West Bank in part to agree to temporarily waive the anticipated financial covenant violations. (*See* Declaration of Bill Nietschmann, March 18, 2010.)

 Based on the foregoing, Telscape has presented sufficient facts indicating that it was "actively seeking capital or business" at the relevant time, that is, as of October 13, 2008.

### B.  <u>Postpone Termination (Section 1402.5(a)(2))</u>

 Section 1402.5(a)(2) requires that the employer must show that the capital or business sought, if obtained, would have enabled the employer to avoid or postpone the relocation or termination. The federal regulations provide that "[t]he employer must be able to objectively demonstrate that the amount of capital or the volume of new business sought would have enabled

Letter to Phil Siegel
Re: Request For Exception Under Labor Code § 1402.5 (Cal-WARN Act)
Page 5

the employer to keep the facility, operating unit, or site open for a reasonable period of time." (*See* 20 C.F.R. § 39.9(a)(3).)

Here, Telscape presented evidence that it attempted to negotiate a $6 million dollar capital investment from Granite Creek. (*See* Affidavit of Philip Siegel, March 23, 2010, Exhibits C-E.) Analyzing the available company financial evidence under financial accounting standards and analysis, it is reasonable to conclude that an additional $6 million in or around October 2008 would have postponed the termination of Telscape's Wireline Service sales operation for at least 3 more quarters into 2009, assuming similar performance as in 2008.

Based on the foregoing, Telscape has presented sufficient facts indicating that the capital sought, if obtained, would have enabled it to at least postpone the termination of its Wireline Service sales operations for a reasonable period of time.

### C.   Reasonable And Good Faith Belief That Giving Notice Would Preclude Employer From Obtaining Capital Or Business (Section 1402.5(a)(3))

Finally, the employer must have a reasonable and good faith belief that giving the notice would have precluded the employer from obtaining the needed capital or business. (*See* Section 1402.5(a)(3).) 20 C.F.R. § 639.9(a)(4) provides in part:

> The employer must be able to objectively demonstrate that it reasonably thought that a potential customer or source of financing would have been unwilling to provide the new business or capital if notice were given, that is, if the employees, customers, or the public were aware that the facility, operating unit, or site might have to close. *This condition may be satisfied if the employer can show that the financing or business source would not choose to do business with a troubled company or with a company whose workforce would be looking for other jobs.*" [emphasis added.]

The information and documents submitted indicate that at the time notice was required, October 13, 2008, Telscape was actively seeking capital or business within the meaning of Section 1402.5(a)(1) or the similar federal exception.

The information and documents submitted sufficiently establish that providing notice would have likely precluded Telscape from securing a purchaser. Bill Nietschmann, Senior Vice President of East West Bank, declared that in his opinion, any notice of significant layoffs or closure while Telscape was in the process of seeking capital would have detrimentally affected Telscape's ability to obtain such capital. (*See* Declaration of Bill Nietschmann, March 18, 2010.) The evidence suggests that Granite Creek was performing due diligence in assessing the viability of investing in Telscape's Wireline Service business. Based on Granite Creek's business inquiries, Telscape had an objectively reasonable basis to believe that giving notice would have likely caused Granite Creek not to do business with a troubled company or with a company

Letter to Phil Siegel
Re: Request For Exception Under Labor Code § 1402.5 (Cal-WARN Act)
Page 6

whose workforce was looking for other jobs.  (*See* Declaration of Nathan Johnson, March 17, 2010, Exhibit A.)

Moreover, Greg McPherson, Chief Operating Officer with Westrec Capital Partners, LLC, an investment firm approached to invest in Telscape noted that had any significant layoffs occurred with respect to Telscape, during the time in which Telscape was actively seeking capital, Westrec would have decided not to provide any additional capital to Telscape because it would no longer be a viable or prudent investment.  (*See* Declaration of Greg McPherson, March 18, 2010.)

Accordingly, based on the information and documents submitted, Telscape has sufficiently established that it had a reasonable and good faith belief, as required under Section 1402.5(a)(3), that notice would have precluded it from obtaining capital or business.

### III.   **CONCLUSION**

Based on the foregoing reasons and under the facts presented here, Telscape has met the requirements under Section 1402.5.  It is therefore entitled to an exception from the employee notice requirements contained in Section 1401.

Dated: July 27, 2010

John C. Duncan, Director
Department of Industrial Relations

Exhibit 4

# DSI Development Specialists, Inc.

Advisory and Fiduciary Services • Corporate Restructuring and Workouts • Interim Management • Insolvency Services

22 October 2012

*e-mail address: gberman@dsi.biz*

TO THE CREDITORS AND SHAREHOLDERS OF

SVTC TECHNOLOGIES, LLC.
3901 N. FIRST STREET
SAN JOSE, CA 95134

Re:   ***GENERAL ASSIGNMENT FOR THE BENEFIT OF CREDITORS***

Please be advised that SVTC Technologies, LLC ("SVTC") executed a general assignment for the benefit of creditors in favor of California Assignments, LLC, (the "Assignee") on Monday, October 15, 2012. This action was taken by the Members of the SVTC (the "Company") after it was determined that it was not possible for the Company to continue operating as a going concern.

The Assignee has been made aware that the Company was financed through a loan from Wells Fargo Bank. Wells Fargo Bank has asserted that the Company was indebted to the Bank in the total amount of $19,752,517.11 plus interest, attorney's fees and expenses prior to assignment.

Additionally, the Assignee has been advised that the Company completed a sale of the assets located at the Company's Austin, TX plant prior to the execution of the general assignment. That sale, to Novati Technologies, Inc. a company related to Tezzaron Semiconductor Corporation, generated a recovery of $6,349,000 net of related expenses. These funds were paid to Wells Fargo Bank as a reduction of its secured loan.

Additionally, the Assignee is aware of the Company's affiliated company, SVTC Solar, Inc. ("Solar"). The Company's assets are separate and distinct from those of Solar. Solar is using a portion of the Company's owned real property (3901 N. First Street, San Jose, CA); Solar also occupied a portion of the leased premises located at the 3833 N. First Street, San Jose, CA facility. Solar has now vacated the leased premises and the Assignee is in the process of returning the leased premises to the landlord.

The Assignee has retained the firm of Stutman, Treister & Glatt LLP (Michael H. Goldstein, Esq.) to serve as its counsel in this assignment estate. The firm is in the process of reviewing the Wells Fargo Bank loan and security documents to confirm the validity of the asserted liens against the Company's assets.

The Assignee has received a number of proposals for the disposition of the plant equipment at the San Jose facilities. The Assignee believes that a sale of the plant equipment in bulk, along with the possible sale of the owned real estate, will likely result in a greater recovery than a piece-meal

LOS ANGELES

333 South Grand Avenue, Suite 4070 • Los Angeles, California 90071-1544 • Telephone: 213.617.2717 • Fax: 213.617.2718 • www.dsi.biz

*SAN FRANCISCO • CHICAGO • NEW YORK • MIAMI • LONDON • PHILADELPHIA • COLUMBUS • CLEVELAND*

SVTC Technologies, LLC
October 22, 2012
Page 2

auction.  Therefore, the Assignee has scheduled a sale of the equipment and real property for November 1, 2012.  The sale will be on reserve, meaning that the sale is subject to the consent of Wells Fargo Bank as the secured creditor and to obtain releases of liens held by the Bank against the assets.

For those of you unfamiliar with general assignments, the process is similar to liquidations administered under Chapter 7 of the Bankruptcy Code.  However California law controls. Experience has proven that in circumstances such as those in this instance, estates administered through general assignments typically return a greater recovery on the assets of the estate, quicker and more economically than the bankruptcy process.  There is no guaranty however in light of the significant amount of alleged indebtedness in this estate that the value of the Company's plant will be sufficient to retire the secured indebtedness.  Creditors should note that California law provides for an assignee to recover preferential transfers made by the Company within the ninety days immediately prior to the making of the general assignment.  No review of the transactions that may qualify as recoverable under California law has been undertaken yet.

Attached hereto creditors will find a form Proof of Claim by which creditors can file their claims with the Assignee.  Please note that pursuant to California law (*see* Code of Civil Procedure §1802) the last day to file proofs of claim in this estate is April 5, 2013.  <u>Creditors who fail to file their proofs of claim by that date will not be entitled to share in any distribution arising out of the liquidation of the Company's assets should there in fact be any funds available for distribution to unsecured creditors.</u>  The Assignee will accept proofs of claim via facsimile, so long as the facsimile is received by the claims bar date April 12, 2013 and the original signed proof of claim is received by the Assignee not later than April 19, 2013.  Please remember to include copies of your supporting invoices or statements with your proof of claim.  The fact that the Assignee is accepting *proofs of claim* is not a guaranty that there will be any recovery by unsecured creditors from the liquidation of the assets of the Company..

Information regarding the general assignment may also be found at <u>www.dsiassignments.com.</u> After returning the form Proof of Claim, creditors are requested to advance their files approximately forty-five days, pending our next report.

Very truly yours,

California Assignments, LLC, solely in its capacity
as Assignee for the Benefit of Creditors of SVTC TECHNOLOGIES, LLC
BY DEVELOPMENT SPECIALISTS, INC., ITS SOLE AND MANAGING MEMBER

By *Geoffrey L. Berman*
   Geoffrey L. Berman

\GLB:SVTC \Notice-1/enclosure – Proof of claim



**Development Specialists, Inc.**

# *PROOF OF CLAIM*

In the Matter of:

**SVTC Technologies, LLC**
**3901 North First Street**
**San Jose, CA**
         **And**
**Austin, TX**

The undersigned creditor of the above listed company hereby submits its claim in the general assignment estate created upon the execution and acceptance of the general assignments in favor of California Assignments, LLC. as of October 15, 2012, in the amount as set forth below, and substantiated by the attached invoices or statement of account.

Date Submitted:_____

Amount of Claim:_____

Please attach an itemized statement to support the amount claimed.

Name of Creditor:_____

By:_____
                                                     Title

Address:_____

City, State & Zip:_____

(     )_____(     )_____
Telephone                              Facsimile

e-mail:_____

*NOTE: Interest on unsecured claims is applicable only to the date of the assignment and then only in the event that interest is payable under either a written agreement that exists between you and the debtor providing for the payment of interest or a judgment.*

*Return completed form to California Assignments, LLC.*
*c/o its Manager, Development Specialists, Inc.*
*333 South Grand Avenue, Suite 4070, Los Angeles, CA 90071*
*(213) 617-2717/FAX (213) 617-2718*

Note:  If faxing the proof of claim, the original must be received by the Assignee by April 19, 2013

Exhibit 5

# _ISI_ Development Specialists, Inc.

Advisory and Fiduciary Services • Corporate Restructuring and Workouts • Interim Management • Insolvency Services

13 December 2012                                                   *e-mail address: gberman@dsi.biz*

TO THE CREDITORS AND SHAREHOLDERS OF

SVTC TECHNOLOGIES, LLC.
3901 N. FIRST STREET
SAN JOSE, CA 95134

Re:     ***GENERAL ASSIGNMENT FOR THE BENEFIT OF CREDITORS***

As you were previously advised, SVTC Technologies, LLC ("SVTC" or the "Company") executed a general assignment for the benefit of creditors in favor of California Assignments, LLC, (the "Assignee") on Monday, October 15, 2012.  This action was taken by the Members of SVTC after it was determined that it was not possible for the Company to continue operating as a going concern.

The Assignee has been made aware that the Company was financed through a loan from Wells Fargo Bank.  Wells Fargo Bank has asserted that the Company was indebted to the Bank in the total amount of $19,752,517.11 plus interest, attorney's fees and expenses prior to assignment.  The Company completed a sale of the assets located at the Company's Austin, TX plant prior to the execution of the general assignment.  That sale, to Novati Technologies, Inc. a company related to Tezzaron Semiconductor Corporation, generated a recovery of $6,349,000 net of related expenses.  These funds were paid to Wells Fargo Bank to reduce its secured loan.

After the execution of the general assignment, and as we previously advised, the Assignee noticed a sale of the San Jose FAB equipment (in bulk) and the owned real property.  The sale was conducted on November 1, 2012.  The Assignee accepted an offer for both the equipment and the real property submitted jointly by Telefunken Semiconductor, Inc., Counsel RB Capital and BidItUp, Inc.  Subsequent to but before consummation of the sale, Counsel RB Capital and BidItUp, Inc. withdrew from the offer for the assets.  The Assignee completed the agreement to sell the equipment and real property on November 15, 2012.  The equipment sale realized $7.25 million, which was paid to Wells Fargo Bank and applied against its outstanding secured claim.

The real property transfer is subject to the completion of a non-judicial foreclosure which the bank initiated on November 29, 2012.  The non-judicial foreclosure was initiated to clear title to the real property in light of various mechanics liens filed by certain creditors against the real property.  The majority of those mechanics liens were filed by creditors involved in the build out of the SVTC Solar facility located within the 3901 N. First Street property.  Title to the property will transfer upon completion of the foreclosure process or sooner in the event the mechanics lien creditors are paid by SVTC Solar (see below) or agree to otherwise release their liens, all of which are junior to the remaining debt owed Wells Fargo Bank.  The purchase price for the real property is $5.25 million plus payment of certain defined carrying costs.  Telefunken Semiconductor has executed a

LOS ANGELES

333 South Grand Avenue, Suite 4070 • Los Angeles, California 90071-1544 • Telephone: 213.617.2717 • Fax: 213.617.2718 • www.dsi.biz

*SAN FRANCISCO • CHICAGO • NEW YORK • MIAMI • LONDON • PHILADELPHIA • COLUMBUS • CLEVELAND*

SVTC Technologies, LLC
December 6, 2012
Page 2

lease of the premises with the Assignee during the foreclosure period to allow it to begin removal of the purchased equipment.

SVTC Solar, Inc. ("Solar"), which we advised in our earlier communication is a separate legal entity from SVTC Technologies, LLC, completed an asset sale to the Research Foundation for the State University of New York on behalf of the College of Nanoscale Science and Engineering on November 30, 2012. Certain liabilities of Solar were assumed as part of the asset sale, including obligations owing to the general contractor for the build out of the 3901 N. First Street property and the basis for most of the mechanics liens. The Assignee is also completing a sale of the Company owned process intellectual property to Abound (BVI), Ltd. The proceeds from that sale, and the sale of any remaining equipment, will be paid to Wells Fargo Bank and applied against the outstanding loan balance. The Assignee will be vacating the leased premised that housed the company's offices, located at 3833 N. First Street on or before December 14, 2012. The Assignee has been paying rent to the landlord for its post assignment use of the facility; that rent will cease as of the surrender of the property to the landlord.

Attached hereto creditors will find the Statement of Condition prepared from the Company's books and records as of the date of the assignment. The information reflects historical values (cost) and does not represent the current or liquidation value of the assets. Creditors will note that the Company had losses from operations in 2012 of more than $16 million.

Creditors are again reminded to file their claims with the Assignee. The last day to file proofs of claim in this estate is April 5, 2013. Creditors who fail to file their proofs of claim by that date will not be entitled to share in any distribution arising out of the liquidation of the Company's assets should there in fact be any funds available for distribution to unsecured creditors. The Assignee will accept proofs of claim via facsimile, so long as the facsimile is received by April 5, 2013 and the original signed proof of claim is received by the Assignee not later than April 12, 2013. Remember to include copies of all supporting invoices or statements with your proof of claim. The fact that the Assignee is accepting *proofs of claim* is not a guaranty that there will be any recovery by unsecured creditors from the liquidation of the assets of the Company.

Very truly yours,

California Assignments, LLC, solely in its capacity
as Assignee for the Benefit of Creditors of SVTC TECHNOLOGIES, LLC
BY DEVELOPMENT SPECIALISTS, INC., ITS SOLE AND MANAGING MEMBER

By _____
Geoffrey L. Berman

\GLB:SVTC \Notice-2

Enclosure (Statement of Condition)



**DSI** Development Specialists, Inc.

SVTC Technologies,  LLC
Statement of Condition as of October 15, 2012

Assets

| | | |
|---|---|---|
| Cash | $ | 1,413,206 |
| Accounts Receivable | $ | 2,793,462 |
| Inventories | $ | 2,181,570 |
| Prepaid expenses | $ | 683,955 |
| | | |
| Total Current Assets | $ | 7,072,193 |
| | | |
| Property Plant & Equipment | | |
| Net of depreciation | $ | 40,450,107 |
| Intangible Assets | $ | 16,224 |
| Goodwill | $ | - |
| Other Assets | $ | 1,845,738 |
| | | |
| Total Other Assets | $ | 42,312,069 |
| | | |
| Total Assets | $ | 49,384,262 |

Liabilities

| | | |
|---|---|---|
| Accounts payable | $ | 9,627,948 |
| Accrued Liabilities | $ | 3,248,051 |
| Deferred Revenue - current | $ | 279,231 |
| Current portion WFB Revolver | $ | 2,750,000 |
| Current portion WFB Term Loan | $ | 16,901,779 |
| Other Short term debt | $ | 293,755 |
| Other current liabilities | $ | 838,307 |
| | | |
| Term Loan, net of current portion | $ | - |
| Other Long Term liabilities | $ | 16,710,231 |
| Total Liabilities | $ | 50,649,302 |

Member's Equity

| | | |
|---|---|---|
| Retained Member Interests | $ | 15,464,594 |
| Current year (loss) | $ | (16,729,634) |
| | | |
| Total Shareholder's Equity | $ | (1,265,040) |
| | | |
| Total Liabilities & Shareholder Equity | $ | 49,384,262 |

Notes:
Unaudited based upon SVTC's historical books and records
Assets are stated at historical cost and do not reflect current liquidation values
Liabilities do not include accruing default interest, attorney's fees and expenses

Exhibit 6

# GIRARD GIBBS
## L L P

ATTORNEYS AT LAW

# FIRM RESUME

Girard Gibbs LLP specializes in class action and complex business litigation. Founded in 1995, the firm represents clients throughout the United States in securities, antitrust, product liability, employment and consumer protection actions. Girard Gibbs is currently prosecuting securities actions on behalf of Allianz of America, Inc., Fireman's Fund Insurance Company, Jefferson Life Insurance Company, Preferred Life Insurance Company, AGF Asset Management, Cornhill Life Insurance Company and Merchant Investors Insurance Company Ltd. The firm has represented the Kansas Public Employees Retirement System (KPERS) in several securities actions and currently serves as outside counsel to KPERS with respect to all securities litigation. Girard Gibbs has also served as outside counsel to the California Public Employees Retirement System (CalPERS), the California State Teachers' Retirement System (CalSTRS), the State of Wisconsin Investment Board, the Louisiana Teachers' Retirement System, the Louisiana State Employees Retirement System, and the Los Angeles County Employees Retirement Association.

The firm's partners are experienced in all aspects of class action practice and complex securities and business litigation. Girard Gibbs seeks to apply its experience as plaintiffs' attorneys to manage and resolve civil litigation effectively and efficiently on behalf of all the firm's clients. The firm also provides consulting and preventive counseling services to corporate clients and professionals on a variety of legal issues.

Girard Gibbs was distinguished as a Tier 1 law firm for plaintiffs' mass tort and class-action litigation in the 2013 "Best Law Firms" list, an annual survey published in the U.S. News & World Report's Money Issue. *The National Law Journal (NLJ)* named Girard Gibbs to its elite "Plaintiffs' Hot List" for 2012, a selection of top U.S. plaintiffs' firms recognized for wins in high-profile cases.

## PARTNERS

**Daniel C. Girard** serves as the firm's managing partner and coordinates the prosecution of various securities, antitrust and consumer legal matters handled by the firm.

He has successfully represented investors and consumers in a series of precedent-setting cases. Some of the cases in which Mr. Girard served as lead counsel include Billitteri v. Securities America, Inc., ($150 million settlement), In re American Express Financial Advisors Securities Litigation, ($100 million settlement), In re Prison Realty Securities Litigation, ($104 million settlement), In re i2 Technologies Securities Litigation, ($88 million settlement), and In re MCI Non-Subscriber Rates Litigation, ($90 million). He served as a member of the Executive Committee in the Natural Gas Antitrust Cases I, II, III and IV, antitrust litigation against numerous natural gas companies for manipulating the market for natural gas in California. The Natural Gas litigation resulted in total settlements of nearly $160 million. Mr. Girard served as lead counsel in the In re H&R Block Express IRA Litigation, which resulted in a $19.5 million settlement for low-income consumers. Mr. Girard also represented the California State Teachers Retirement System in litigation in a non-class securities action against Qwest Communications, Inc. and outside auditor Arthur Andersen, resulting in a recovery of $45 million for CalSTRS.

1

Mr. Girard currently serves as co-lead counsel in the In re Wal-Mart Stores Derivative Litigation, representing the California State Teachers' Retirement System in derivative litigation arising out of alleged violations of the Foreign Corrupt Practices Act.  He also serves as co-lead counsel in the In re Apple REIT Securities Litigation, where he represents investors who purchased $5 billion in shares of a series of real estate investment trusts through exclusive seller David Lerner Associates, and in In re Peregrine PFG Best Customer Accounts Litigation, representing customers of a failed futures commission merchant.  He is a member of the executive committee charged with managing In re Lehman Brothers Holdings Securities and ERISA Litigation, multidistrict proceedings arising out of the collapse of Lehman Brothers Holdings, Inc., the largest bankruptcy in United States history.  Mr. Girard also serves as counsel to several public and private institutional investors in securities litigation matters both domestically and abroad, and he assists in the prosecution of several international arbitration proceedings on behalf of European clients.

Mr. Girard was appointed by the late Chief Justice Rehnquist to serve on the United States Judicial Conference Committee on Civil Rules in 2004, and reappointed by Chief Justice John Roberts to a second three year term on the Committee in 2007.  As a member of the Civil Rules Advisory Committee's Discovery Subcommittee, he participated in the Committee's drafting of amendments governing electronic discovery, summary judgment and expert discovery. He is a member of the American Law Institute. He serves on the Advisory Board of the Institute for the Advancement of the American Legal System, a national, non-partisan organization dedicated to improving the process and culture of the civil justice system.

Mr. Girard is the co-author of *Limiting Evasive Discovery: A Proposal for Three Cost- Saving Amendments to the Federal Rules*, 87 DENV. U. L. REV. 213, 473 (2010) and *Managez efficacement vos litiges d'affaires*, Extrait du magazine, Décideurs N°121, November 2010.  Other published articles include:  *Stop Judicial Bailouts*, The National Law Journal, December 1, 2008, and *Billions to Answer For*, Legal Times, September 15, 2008.   He is a frequent speaker on issues of electronic discovery, class actions and financial fraud, including the following presentations: *Recent Developments in U.S. Arbitration Law,* Conference on Business Law in Africa, Abidjan, Côte d'Ivoire, October 2012; *Bringing and Trying a Securities Class Action Case*, American Association for Justice 2012 Annual Convention, July 2012; Panel *on Class Actions,* U.S. Judicial Conference Standing Committee on Rules of Practice and Procedure, Phoenix, January 2012*; Panel on Paths to (Mass) Justice,* Conference on Globalization of Class Actions and Mass Litigation, The Hague, December 2011*; Contentieux et Arbitrage International: les bons réflexes à acquérir (Litigation and International Arbitration: acquiring the right reflexes)*, Paris, France, March 2011; *Panel on Proposals for Rule Amendments and Preservation Obligations*, United States Judicial Conference Advisory Committee on Rules of Practice and Procedure, San Francisco, January 2011; *Panel on Dispositive Motions*, 2010 United States Judicial Conference Advisory Committee on Civil Rules, Litigation Conference, Duke Law School, May, 2010; "*Iqbal/Twombly Fallout- Are General Federal Rules Passé?*," ABA, Section of Litigation Annual Conference, April 22, 2010; "*Opportunities for Cooperation between Plaintiffs' Counsel in Global Financial Frauds*," Financial Fraud- Background and Litigation Panel, Global Justice Forum, October 16, 2009; "*Les tendances des contentieux Américains issus de la crise financière*," Paris, France, May 12, 2009; "*Ethical Issues in E-Discovery*," Electronic Discovery and Records Retention Conference, Thomson Reuters,

2

December 10, 2008; "*How the Economic Crisis is Affecting U.S. Class Actions*," Asset Managers Working Group on U.S. Class Actions, Paris, France, October 14, 2008; "*Auction Rate Securities: The Real Story*," NERA's Eleventh Annual Finance, Law and Economics Securities Seminar, July 2008; "*Electronic Discovery and the Amended Rules After a Year...What's New? What's Next?*," Emerging Ethics Issues in E-Discovery, West LegalWorks, February 26, 2008; "*The Subprime Loan Crisis- Strategies for Pension Fund Counsel*," 2008 NAPPA Investment Roundtable, February 7, 2008; "*Class Action Litigation in the United States*," Presentation for Japanese Fact-Finding Mission on Class Actions in the United States, June 13, 2007.

Mr. Girard is a member of the Business Law Section of the American Bar Association and currently serves as the Section's representative on the Task Force on Federal Preemption. He is past Chair of the Business Law Section's Subcommittee on Class Actions, Co-Chair of the Business and Corporate Litigation Committee's Task Force on Litigation Reform and Rule Revision, and Vice-Chair of the Business and Corporate Litigation Committee. He has served as a guest lecturer on class actions and complex litigation at the UC Davis Law School, UC Berkeley (Boalt Hall), UC Hastings College of the Law, and Stanford Law School.

Mr. Girard was selected for inclusion in *The Best Lawyers in America* (2012-2013) for his work in class action and securities litigation. *Best Lawyers* also named him the 2013 "Lawyer of the Year" in San Francisco for Mass Tort Litigation / Class Actions - Plaintiffs. Mr. Girard has been consistently honored as a *Northern California Super Lawyer* (2007-2012), and has also earned the distinction of being included in the "Top 100 Super Lawyers" in Northern California. He has been named among the highest class of attorneys for professional ethics and legal skills with an *AV-Preeminent* rating by Martindale Hubbell, and was featured in the 2012 edition of San Francisco's Top *AV-Preeminent* Rated Lawyers.

He served as a member of the Board of Trustees of St. Matthew's Episcopal Day School in San Mateo, California from 2003-2008, including three years as board chair from 2005-2008. He served as a volunteer conservation easement monitor for the Peninsula Open Space Trust from 1991 to 2010.

He is a 1984 graduate of the School of Law, University of California at Davis, where he served as an editor of the Law Review. He received his undergraduate degree from Cornell University in 1979. Mr. Girard is a member of the California Bar.

**Eric H. Gibbs** specializes in the prosecution of consumer and employment class actions. Mr. Gibbs has served as court-appointed lead counsel, class counsel and liaison counsel in numerous class actions throughout the United States.

He has successfully prosecuted more than 75 class action matters, including cases involving defective products, telecommunications, credit cards, unfair competition, false advertising, truth-in-lending, product liability, credit repair, employment misclassification and wage and hour under both state and federal law. Some of the recent cases in which Mr. Gibbs served as court appointed class counsel and achieved favorable results for class members include Smith vs. The Regents of the University of California (negotiated a material change in UCSF's privacy practices on behalf of a certified class of current and former patients of the UCSF

medical center for unlawful disclosure of confidential medical information);  In Re: Pre-Filled Propane Tank Marketing and Sales Practices Litigation (negotiated cash reimbursements of up to $75 per class member for the purchase of allegedly under-filled propane tanks- Court approval pending), Browne et al. v. American Honda Motor Co., Inc., (negotiated class settlement providing for cash reimbursements of up to $150 for rear brake pad replacement expenses in certain Honda and Acura vehicles), Collado v. Toyota Motor Sales, U.S.A., Inc. (negotiated a class settlement providing for a free warranty extension and cash reimbursements for many Prius owners who paid for headlight repairs), In Re Mercedes-Benz Tele Aid Contract Litigation (negotiated a class settlement providing for cash reimbursements of $650, or new vehicle credits for up to $1,300), Parkinson v. Hyundai Motor America (achieved nationwide class certification and settlement providing for cash reimbursements for certain flywheel / clutch parts repairs in 2003 Hyundai Tiburons), Refuerzo v. Spansion LLC, (negotiated more than $8.5 million in cash settlements on behalf of a certified class of former employees in a class action for violations of the WARN Act), In Re General Motors Dex-Cool Cases (negotiated cash reimbursements from $50 to $800 per class member vehicle repair), Bacca v. BMW of North America (negotiated reimbursement for sub-frame repair expenses and Nationwide Sub-frame Inspection and Repair Program), and Piercy v. NetZero (achieved nationwide class settlement providing cash reimbursements, and changes in billing and account practices).  He conducted a two-week arbitration resulting in a liability and damages award on behalf of a certified class of current and former account representatives of Masco Retail Cabinet Group who alleged they were misclassified under the Fair Labor Standards Act.

Mr. Gibbs was appointed as interim class counsel on the Plaintiffs' Executive Committee in the In re Chase Bank U.S.A., N.A. "Check Loan" Contract Litigation, multi-district litigation alleging that Chase Bank wronged consumers by offering them long-term fixed-rate loans, and then attempting to deny them the benefit of their bargain by more-than-doubling their loan payments.  He led recent settlement negotiations in the case, which resulted in a $100 million settlement with Chase eight weeks prior to trial.  He serves as interim class counsel in Milano v. Interstate Battery System of America, Inc., representing purchasers of automobile batteries in a breach of warranty action.

Other significant consumer class actions in which Mr. Gibbs acted in a leadership role include Mitchell v. American Fair Credit Association and Mitchell v. Bankfirst, N.A., which generated one of the largest settlements in the United States under the credit services laws (over $40 million); Providian Credit Card Cases, which resulted in one of the largest class action recoveries in the United States arising out of consumer credit card litigation ($105 million); In Re Ipod Cases (achieved settlement in California state-court class action alleging material misrepresentations respect to the battery life providing for warranty extensions, battery replacements, cash payments, and store credits to those class members who experienced a battery failure), Roy v. Hyundai Motor America (negotiated nationwide class settlement providing for the repair of allegedly defective passenger-side airbags, reimbursement for transportation related expenses, and an alternative dispute resolution program allowing for trade-ins and buy-backs), Paul v. HCI Direct (achieved nationwide class certification and settlement on behalf of consumers charged for merchandise they allegedly did not knowingly order), Kim v. BMW of North America (negotiated nationwide class settlement providing for notification program and free vehicle repair related to passenger-side airbags), In re LookSmart Litigation, a nationwide class action settlement providing cash and benefits valued at approximately $20 million; and Fantauzzo v. Razor, where plaintiffs alleged that defendant marketed and sold electric scooters

with defective stopping mechanisms, the court approved a nationwide class action settlement providing for, among other things, a recall of the potentially defective electric scooters.

Mr. Gibbs has lectured on consumer class actions, including as a featured speaker addressing *Strategic Considerations Under CAFA following Supreme Court's Rulings in Shady Grove and Purdue* at the Bridgeport 9th Annual Class Action Litigation Conference; *Current Issues Arising in Attorney Fee Negotiations, Including Best Practices* at the 2010 AAJ Annual Convention; *Dealing With Objectors* at the Consumer Attorneys of California 3rd Annual Class Action Seminar; *What is a Class Action?* at the CAOC Annual Ski Seminar; *After the Class Action Fairness Act* at CAOC's 1st Annual Class Action Seminar; *Class Certification In Consumer Cases* for the Litigation Section of the Barristers Club of the San Francisco Bar Association; and *Successfully Obtaining Attorneys' Fees Under Fee-Shifting Statutes* for the Consumer Rights Section of the Barristers Club of the San Francisco Bar Association. Mr. Gibbs is the co-author of *Consumer Class Actions in the Wake of Daugherty v. American Honda Motor Company*, CAOC's Forum Magazine, January/February 2009.

Mr. Gibbs was recently selected by his peers for inclusion in *The Best Lawyers in America* (2012-2013) for his work in Mass Tort Litigation/ Class Actions, and was honored as a *Northern California Super Lawyer* (2010-2012). He also earned the additional distinction of being included among the "Top 100 Super Lawyers" in Northern California. With an *AV-Preeminent* rating from Martindale-Hubbell, Mr. Gibbs has been named among the highest class of attorneys for professional ethics and legal skills, and was featured in the 2012 edition of San Francisco's Top *AV-Preeminent Rated Lawyers*.

Mr. Gibbs is the co-chair and editor of the Quarterly Newsletter for the Class Action Litigation Group of the American Association for Justice (AAJ), and is a member of the Board of Governors of the Consumer Attorneys of California. He is a member of Public Justice, serving on the Class Action Preservation Project Committee. He is also a member of the American Bar Association, the National Association of Consumer Advocates, the Alameda County Bar Association, and the San Francisco Trial Lawyers Association.

Mr. Gibbs is a 1995 graduate of the Seattle University School of Law. He received his undergraduate degree from San Francisco State University in 1991. Before joining Girard Gibbs, he worked for two years as a law clerk for the Consumer Protection Division of the Washington Attorney General's Office. He is a member of the California Bar.

**A. J. De Bartolomeo** has more than twenty years of experience in complex litigation, including the prosecution and defense of class actions arising under the securities, communications, consumer protection and copyright laws. Her experience extends to the prosecution of pharmaceutical and medical device litigation as well as the collection of class action recoveries and claims administration in bankruptcy proceedings. She has served as court-appointed lead counsel and class counsel in several class actions throughout the United States.

Ms. De Bartolomeo served as Lead Counsel in Telstar v. MCI, Inc. (S.D.N.Y) (achieved settlement for over $2.8 million in cash on behalf of class of commercial subscribers alleging FCA violations), Lehman v. Blue Shield (Cal. Super. Ct. San Francisco County) (parties negotiated a settlement for over $6.5 million in cash on behalf of class of subscribers overpaying insurance premiums), Powers Law Offices v. Cable & Wireless, USA (D. Mass.) (Bankr. D.

Del.) (achieved settlement for over $2.2 million in cash after Chapter 7 filing on behalf of Rule 23(b)(3) certified class of commercial customers alleging FCA violations), and In re Cosmo Store Services, (Bankr. C.D. Cal.) (achieved settlement for $1 million in cash after Chapter 11 filing on behalf of class of unsecured creditor employees).  Ms. De Bartolomeo has also held a leadership position in In re American Express Advisors Securities Litigation (S.D.N.Y), CALSTRS v. Quest Communications, et al. (Cal. Super. Ct. San Francisco County), Cromwell v. Sprint Communications (D. Kan), and Brennan v. AT&T Corp. (S.D. Ill.).  Ms. De Bartolomeo served as second chair in In re MCI Non-Subscriber Rates Litigation (MDL, S.D. Ill.) ($88 million settlement).  From 2005 to 2008, A. J. De Bartolomeo served on the Discovery and Law Committees in the In Re Medtronic, Inc. Implantable Defibrillators Product Liability Litigation, MDL No. 05-1726 (JMR/AJB) (D.Minn.).

Ms. De Bartolomeo currently serves on the Plaintiffs' Steering Committee of the In Re: Yasmin and YAZ (Drospirenone) Marketing, Sales Practices and Products Liability Litigation. She was appointed to the Plaintiffs' Steering Committee in the Transvaginal Mesh Multi-District Litigation, responsible for overseeing the coordinated litigation for over 700 transvaginal mesh lawsuits.

Ms. De Bartolomeo has been named among the highest class of attorneys for professional ethics and legal skills with an AV-Preeminent rating by *Martindale Hubbell*.  She is a member of the American Bar Association Sections on Litigation, Business Law and Communications, the American Bankruptcy Institute, Consumer Attorneys of California and the American Association for Justice. She also is also a former member of the National Association of Public Pension Attorneys, where she was an active participant in the Task Force on Securities Litigation and Damage Calculation, as well as a member of the Council of Institutional Investors.

Ms. De Bartolomeo has been invited to speak on consumer and securities class actions, as well as the settlement approval process before defense law firms, institutional investors and government committees; most recently, for the Women's Leadership Summit at the AAJ Annual Convention and the Fact-finding Mission to Class Actions in the United States, sponsored by the Japan Federation of Bar Associations and Kyoto Bar Association.   She is the author of "*Facilitating the Class Action Approval Process*," AAJ's Women Trial Lawyers Caucus Newsletter, summer 2010.

Ms. De Bartolomeo is a 1988 graduate of the University of California, Hastings College of the Law. She received her undergraduate degree from Fairfield University in 1982, and a General Course degree in Economics from the University of London, London School of Economics and Political Science (1981). Before joining Girard Gibbs, Ms. De Bartolomeo was an associate with Robins Kaplan Miller & Ciresi and a Staff Attorney with the Securities and Exchange Commission (Enforcement Division). She is admitted to the California Bar. She also is admitted to practice before the United States Supreme Court, the United States Courts of Appeals for the First and Ninth Circuits, and the United States District Courts for the District of Michigan, the Southern District of Texas, the Eastern District of Wisconsin, and the Northern, Eastern, Central and Southern Districts of California.

**Jonathan K. Levine** has more than 24 years of experience prosecuting complex securities fraud, accounting fraud and class action litigation.  He has served and is serving in a leadership capacity in numerous complex class actions in federal courts throughout the United

States and in state courts in California. Mr. Levine has prosecuted over 30 securities fraud actions successfully, including cases of complex accounting fraud. Some of the cases in which Mr. Levine served in a leadership role include In re American Express Financial Advisors Securities Litigation ($100 million settlement), Rosen v. Macromedia, Inc. ($48 million settlement), In re Gupta Corporation Securities Litigation ($15 million settlement), Provenz v. Miller ($15 million settlement), and Providian Credit Card Cases, where as co-lead counsel he obtained a class action settlement of $105 million, one of the largest class action recoveries in the United States arising out of consumer credit card litigation.

Mr. Levine is also experienced in derivative litigation, having served as lead attorney in Wixon v. Wyndham Resort Development Corporation, a class and derivative action alleging that the directors of WorldMark violated their fiduciary duties by taking actions for the financial benefit of Wyndham, the timeshare developer, to the detriment of the timeshare owners. Mr. Levine led the firm's pre-trial preparation in In re SLM Corp. Securities Litigation. He also participates in the firm's representation of structured note holders in the In re Lehman Brothers Equity/Debt Securities Litigation.

He is the author of "*E-Mail and Voice Mail Discovery Issues*," Glasser LegalWorks (1998), "*Discovery Techniques in Commercial Litigation and Recent Developments In the Rules of Discovery*," American Trial Lawyers Association (1991), and the co-author of "*The Business Judgment Rule and Derivative Actions*," Practicing Law Institute (1989). He has lectured on securities litigation under the Private Securities Litigation Reform Act of 1995, consumer fraud and predatory lending litigation, and computer discovery and electronic data retention risk control, most recently as a featured speaker addressing *Successful Direct Examination of Expert Witnesses* at the Bridgeport 2011 Conference on Working With and Deposing Experts (March 2011). Mr. Levine is a member of the Committee on Federal Courts of the State Bar of California. He is the past chair of the American Bar Association Litigation Section Subcommittee on Officers and Directors Liability. He also currently serves on the Piedmont Planning Commission.

For nine years prior to joining Girard Gibbs, Mr. Levine was a partner of a New York law firm, where he specialized in securities fraud, accounting fraud and consumer class action litigation. Mr. Levine is a 1988 graduate of Fordham University School of Law. He received his undergraduate degree from Columbia University in 1985. Mr. Levine is a member of the California, New York and Connecticut Bars, and is admitted to practice in federal courts throughout the United States.

**Amanda M. Steiner** specializes in the prosecution of complex securities and consumer class actions. She helped achieve recoveries on behalf of class members in Billitteri v. Securities America, Inc., ($150 million settlement achieved on behalf Provident Royalties and Medical Capital investors). She is currently involved in the prosecution of In re SLM Corporation Securities Litigation, representing a certified class of investors in SLM common stock. She also participates in the firm's representation of structured note-holders in the In re Lehman Brothers Equity/Debt Securities Litigation.

Ms. Steiner was selected for inclusion in *Northern California Super Lawyers* in 2012. She is a 1997 graduate of the University of California at Berkeley, Boalt Hall School of Law, where she served as an Associate Editor for the *Berkeley Journal of Employment and Labor Law*

(1995-96) and Articles Editor for the *Berkeley Women's Law Journal* (1994-97). She received her undergraduate degree, *cum laude,* from Carleton College in 1991.  Prior to joining Girard Gibbs, Ms. Steiner handled a variety of complex litigation matters, including cases involving defective products, employment, real estate development, construction issues, commercial and real estate contracts, mortgages and trust deeds, and lender-related disputes.

Prior to obtaining her law degree, Ms. Steiner served as an extern for U.S. District Court Judge Marilyn Hall Patel, and also worked as a law clerk for the Criminal Division of the U.S. Attorney's Office, the Alameda County District Attorney, and the Hopi Appellate Court Clinic and Tribal Law Project.  She is admitted to the California, New York and Washington Bars.  She is also admitted to practice before the United States Court of Appeals for the Ninth Circuit as well as the United States District Court for the Northern District of California and the Western and Eastern District of Washington.

**Dylan Hughes** specializes in the prosecution of consumer and employment class actions. He represents consumers in cases involving defective products, telecommunications, credit cards, product liability, credit repair, employment misclassification and wage and hour under state and federal laws. Mr. Hughes has extensive experience prosecuting complex automobile-defect cases and helped achieve recoveries on behalf of class members in the In Re General Motors Dex-Cool Cases (settlement of $50 to $800 cash reimbursements per class member vehicle repair) and In Re General Motors Cases, a certified California state court class action against General Motors alleging violations of California's "Secret Warranty" law, California Civil Code § 1794.90 et seq. Mr. Hughes is currently involved in the Parkinson v. Hyundai Motor America lawsuit, a class action against Hyundai for engaging in unfair and deceptive practices by selling vehicles with defective flywheel systems, recently granted class certification.

Mr. Hughes was selected for inclusion in *Northern California Super Lawyers* in 2012. He is a 2000 graduate of the University of California, Hastings College of Law. He received his undergraduate degree from the University of California at Berkeley in 1995. Mr. Hughes was a spring 2000 extern for the Honorable Charles A. Legge of the United States District Court, Northern District of California.

Before joining Girard Gibbs, Mr. Hughes was a law clerk for the Honorable Paul A. Mapes, Administrative Law Judge of the Office of Administrative Law Judges, United States Department of Labor. He is a member of the American Bar Association, Consumer Attorneys of California, the Class Action Litigation Group of the American Association for Justice and the Consumer Rights Section of the Barristers Club. He is admitted to the California Bar and is admitted to practice before the United States Court of Appeals for the Ninth Circuit as well as the United States District Courts for the Northern and Central Districts of California.

**John A. Kehoe** is a partner in the firm's New York office specializing in the prosecution of securities and financial fraud cases on behalf of institutional clients and individual investors.

Mr. Kehoe has served as court-appointed lead counsel or co-counsel in numerous securities and antitrust class actions in state and federal courts throughout the United States, including: In re Bank of America Corporation Securities Litigation ($2.425 billion class settlement); In re Vitamins Antitrust Litigation ($2.2 billion in federal and state class and direct action settlements); In re Wachovia Preferred Securities and Bond/Notes Litigation ($627

million class settlement); Underline Re Initial Public Offering Securities Litigation ($586 million class settlement resolving 309 consolidated actions); In re Lehman Brothers Securities and ERISA Litigation ($516 million class settlement); Ohio Public Employees Retirement System et al. v. Freddie Mac ($410 million class settlement); In re Bristol Myers Squibb Securities Litigation ($300 million class settlement); Smajlaj v. Brocade Communications Systems ($160 million class settlement); and In re Marvell Technology Group Ltd. Securities Litigation ($72 million class settlement).

Prior to joining Girard Gibbs, Mr. Kehoe was a partner with Kessler Topaz Meltzer & Check, LLP representing institutional investors in securities class actions and direct actions, and was previously associated with Clifford Chance LLP, a London-based global law firm where he represented Fortune 500 companies in securities and antitrust civil litigation, and in enforcement actions brought by the Department of Justice, the U.S. Securities and Exchange Commission, and the Federal Trade Commission.  Prior to receiving his law degree, Mr. Kehoe served as a police officer in the State of Vermont, and was a member of the Special Reaction Team, the Major Accident Investigation Team, and received advanced police instruction from the Florida Institute of Police Technology and Management.

Mr. Kehoe is a program faculty member with the National Institute of Trial Advocacy, and serves as an adjunct faculty member with the Trial Advocacy Training Program at the Louisiana State University School of Law.  He also presents on issues involving securities litigation at conferences, such as the Rights and Responsibilities for Institutional Investors (Amsterdam, Netherlands); the European Pensions Symposium (Marbella, Spain); the Public Funds Symposium (Washington, D.C.); National Conference on Public Employee Retirement Systems (Miami, FL); Investment Education Symposium (New Orleans, LA); Public Finds West Summit (Scottsdale, AZ); and the Pennsylvania Public Employees Retirement Summit (Harrisburg, PA).

Mr. Kehoe is a 1997 graduate, magna cum laude, of Syracuse University College of Law, where he served as an Associate Editor of the Syracuse Law Review, Associate Member of the Syracuse Moot Court Board, and Alternate Member on the National Appellate Team.  Mr. Kehoe received his Masters of Public Administration from the University of Vermont and his undergraduate degree from DePaul University.  He is a member of the New York and Pennsylvania Bars, and is admitted to practice before the Court of Appeals for the Second and Eleventh Circuits, as well as the U.S. District Court for the Southern District of New York.

## ASSOCIATES

**Tucker Cottingham** is a 2011 graduate of the University of San Francisco School of Law, where he served on the Executive Board of the *Intellectual Property Law Bulletin* and founded the USF Clean Technology and the Law Symposium.  He received his undergraduate degree in classics from Kenyon College in 2007.  Mr. Cottingham was a 2010 certified law clerk for the U.S. Attorney's Office, and a Judicial Law Clerk for the California Public Utilities Commission.  He is admitted to the California Bar.

**Matthew B. George** is a 2005 graduate of the University of Michigan Law School. He received his undergraduate degree, *magna cum laude*, from Chapman University in 2002, where he was a Presidential Scholar. He was a featured speaker addressing *Class Action Settlement*

9

*Strategies and Mechanics* at the 12th Annual Bridgeport Class Action Litigation & Management Conference (April 2012), and *Developments in the Arbitration of Wage and Hour Disputes* at the Bridgeport 2010 Wage and Hour Conference (October 2010).

He was selected in 2011 and 2012 as a *Rising Star* by *Northern California Super Lawyers*, recognizing him as one of the best young attorneys practicing in Northern California. He is a member of the American Bar Association- Section of Labor and Employment Law and Young Lawyers Division, Consumer Attorneys of California, and BALIF. Before joining Girard Gibbs, Mr. George represented employees in complex labor and employment actions in both federal and California state courts. Mr. George is admitted to the California Bar, as well as the United States District Court for the Northern, Central, and Eastern Districts of California and the District of Colorado.

**Scott Grzenczyk** is a 2011 graduate of the University of California, Davis, School of Law, where he was the Chair of the Moot Court Board and the Executive Editor of the UC Davis Journal of International Law and Policy. He was the recipient of the Witkin Award for Legal Research and Writing, Best Brief and Best Advocate awards in his moot court class, and numerous awards at national moot court competitions. He was also a member of the Law School's national mock trial team and the law school faculty named him as a member of the Order of the Barristers. Scott received his undergraduate degree in political science and certificate in political theory from Princeton University in 2006. Scott has appeared before the Ninth Circuit Court of Appeals and the Federal District Court for the Eastern District of California.

**Geoffrey A. Munroe** is a 2003 graduate of the University of California at Berkeley, Boalt Hall School of Law, where he was the recipient of the American Jurisprudence Award in Torts, Business Law & Policy and Computer Law. He received his undergraduate degree in chemistry from the University of California at Berkeley in 2000. Since joining Girard Gibbs in 2007, Mr. Munroe has worked on several high-profile consumer protection class action matters involving complex issues in both federal and state courts throughout the United States.

He has been selected as a *Rising Star* by *Northern California Super Lawyers* (2010-2012), recognizing him as one of the best young attorneys practicing in Northern California. He is the co-author of "*Consumer Class Actions in the Wake of Daugherty v. American Honda Motor Company*," CAOC's Forum Magazine, January/February 2009, and a frequent contributor to the Class Action Litigation Group Newsletter of the American Association for Justice. Mr. Munroe is a member of the Public Justice Class Action Preservation Project Committee, the Class Action Litigation Group of the American Association for Justice and the Consumer Attorneys of California. He is a member of the California Bar and is admitted to practice before the United States Court of Appeals for the Ninth Circuit, as well as the United States District Courts for the Northern, Central and Southern Districts of California.

**Ian Samson** is a 2011 graduate, *cum laude*, of the University of California, Hastings College of the Law, where he was a Senior Supervising Editor for the Hastings Constitutional Law Quarterly and authored *Boumediene as a Constitutional Mandate: Bivens Actions at Guantánamo Bay*, 38 Hastings Const. L.Q. 439 (2011). He was also the recipient of the Best Brief Award in his moot court class and Witkin award in his Civil Procedure II, Effective Representation in Mediation, and Sale and Lease of Goods courses. Ian received his

undergraduate degree in history and international studies: comparative religion, *magna cum laude*, from the University of Washington in 2007. Mr. Samson was a fall 2010 extern for the Honorable Marsha S. Berzon of the Ninth Circuit Court of Appeals in San Francisco. He is admitted to the California Bar.

**Dena Sharp** is a 2006 graduate, *cum laude*, of the University of California, Hastings College of Law, where she was a member of the Thurston Society and was the recipient of the Best Oral Advocate Award. She was also the recipient of the Witkin Award in Legal Writing and Criminal Law. She received her undergraduate degree in history, *magna cum laude*, from Brown University in 1997. Ms. Sharp was a summer 2005 extern for the Honorable Phyllis J. Hamilton of the United States District Court, Northern District of California. Ms. Sharp also served as a spring 2005 extern for the Honorable John E. Munter, San Francisco Superior Court.

She was selected from 2009 through 2012 as a *Rising Star* by *Northern California Super Lawyers*, recognizing her as one of the best young attorneys practicing in Northern California. She is a member of the American Bar Association, the Bar Association of San Francisco and the San Francisco Trial Lawyers Association. Ms. Sharp is admitted to the California Bar. She is also admitted to practice before the United States District Courts for the Northern, Central, Eastern and Southern Districts of California.

**David Stein** is a 2007 graduate of the Emory University School of Law, where he was the Executive Notes & Comments Editor for the *Emory Bankruptcy Developments Journal* and authored *Wrong Problem, Wrong Solution: How Congress Failed the American Consumer*, 23 Emory Bankr. Dev. J. 619 (2007).  He received his undergraduate degree in philosophy from the University of California at Santa Barbara in 2003.  Before joining Girard Gibbs, Mr. Stein was served as judicial law clerk to the Honorable Keith Starrett, United States District Court for the Southern District of Mississippi and to Magistrate Judge Karen L. Hayes, United States District Court for the Western District of Louisiana.  Mr. Stein is admitted to the California Bar.

**Lesley V. Tepper** is a 2010 graduate of the University of San Francisco School of Law, where she was a member of the Investor Justice Clinic, assisting investors in legal actions involving allegations of wrongdoing by securities firms. She received her undergraduate degree in International Relations with a minor in Peace and Conflict Studies from the University of Southern California in 2007. Ms. Vittetoe was a spring 2010 extern for the Honorable William Alsup of the United States District Court, Northern District of California.  Prior to joining Girard Gibbs, Ms. Vittetoe represented investors in securities arbitration and other dispute resolution proceedings before the Financial Industry Regulatory Authority (FINRA) against brokers and brokerage firms. She is a member of the California Bar.

**Janice Yi**  is a 2007 graduate of UCLA School of Law, where she was an Articles Editor for the Asian Pacific American Law Journal, secretary of the Asian Pacific Islander Law Student Association, and a graduate student instructor for Wills and Trusts. She was a summer law clerk at the San Francisco Attorney's Office specializing in Construction Litigation. Ms. Yi received her undergraduate degrees in Legal Studies and Sociology from UC Berkeley in 2003. She is admitted to the California Bar.

**Amy Zeman** is a 2010 graduate, *magna cum laude*, of the University of California, Hastings College of Law, where she was a member of the Thurston Society and served on the

Hastings Law Journal. She received her undergraduate degrees in German and Art History and Archaeology, *summa cum laude*, from the University of Missouri in 1998. Ms. Zeman was a spring 2010 extern for the Honorable Marilyn Hall Patel of the United States District Court, Northern District of California. She is admitted to the California Bar.

## OF COUNSEL

**Michael S. Danko** is a renowned trial lawyer with more than 25 years of legal experience.  He represents individuals who have suffered catastrophic personal injuries, as well as families of wrongful death victims in cases involving product defects, defective medications and medical devices, airplane and helicopter accidents, and dangerous structures.  He has tried cases in state and federal courts throughout the country, and has won numerous eight-figure verdicts on behalf of his clients.

Mr. Danko represents dozens of victims of a Pacific Gas & Electric gas explosion and serves on the Plaintiffs' Steering Committee in a California state coordinated proceeding San Bruno Fire Cases, JCCP No. 4648.  He also serves on the Science Committee for Plaintiffs in In Re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Products Liability Litigation, MDL No. 2100.

In 2009, he won a $15 million jury verdict for a client injured by a defective aircraft part, which has earned him a nomination for 2009 California Trial Lawyer of the Year by the Consumer Attorneys of California.

Mr. Danko's trial advocacy has helped bring about significant reforms and changes to corporate policies as well.  As lead counsel in In Re Deep Vein Thrombosis Litigation, MDL No. 04-1606 (N.D. Cal.) he represented more than one hundred air travelers who had suffered strokes, pulmonary emboli, or heart attacks as a result of airline-induced blood clots.  He developed theories of liability and proof regarding the cause of his clients' injuries that lead to virtually every major air carrier warning air travelers about the risks of deep vein thrombosis and the steps that can be taken to mitigate those risks. Mr. Danko also represented parents of children who were injured or killed by a popular candy made by a foreign manufacturer.  His work in proving that the candy's unusual ingredients and consistency made it a choking hazard resulted in the candy being removed from Costco and Albertson's stores nationwide, and helped lead the FDA to ban the candy from further import into the United States.

He has been named a *Northern California Super Lawyer* each year since the award's inception in 2004.  He is a *Lawdragon 500* finalist.  In 2010, he was named one of the *Best Lawyers in America.*  He is a member of the American Association for Justice, the Lawyer Pilots Bar Association and the Consumer Attorneys of California, where he serves on the board of governors.  Mr. Danko received his AB degree from Dartmouth College, magna cum laude in 1980 and earned his JD from the University of Virginia School of Law in 1983.

**Kristine Keala Meredith** is a trial attorney specializing in product liability litigation.

She served as co-lead counsel with Mr. Danko representing more than one hundred air travelers who had suffered strokes, pulmonary emboli, or heart attacks as a result of airline-induced blood clots in *In Re Deep Vein Thrombosis Litigation*, MDL No. 1606.

Ms. Meredith served on the Law and Motion committee in *In Re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Products Liability Litigation,* MDL No. 2100, where she assisted in the successful opposition to 15 *Daubert* motions in fewer than three weeks.

Before devoting her practice to representing plaintiffs, Ms. Meredith worked on the national defense counsel teams for medical device manufacturers in multi-district litigation including, *In re Silicone Gel Breast Implants Product Liability Litigation* MDL No. 926; and, *In re Orthopedic Bone Screw Product Liability Litigation* MDL No. 1014. She also represented doctors and hospitals in defense of medical malpractice actions, where she worked with some of the world's leading medical experts.

In 2010, Ms. Meredith was named a *Northern California Super Lawyer*. She is currently an officer of the American Association for Justice and the San Mateo County Trial Lawyers Association. She is also a member of the San Francisco Trial Lawyers Association and the Consumer Attorneys of California. She is a former chair of the Minority Issues Committee of the San Francisco Bar Association Barrister Club.

She obtained her B.S. with honors from the University of California at Davis and was awarded a scholarship to attend Brigham Young University's J. Reuben Clark Law School. While in law school, she was awarded the Distinguished Student Service Award and spent a semester at Howard University Law School in Washington, D.C., as a member of the faculty/student diversity exchange.

## SIGNIFICANT RECOVERIES

Some of the cases in which the firm has had a leadership role are described below:

***In Re Chase Bank USA, N.A. "Check Loan" Contract Litigation***, Case No. 09-2032 (N.D. Calif., 2009). Girard Gibbs served on the plaintiffs' executive committee in this nationwide class action lawsuit brought against Chase Bank USA, N.A. after the credit card issuer more than doubled minimum monthly payments and imposed an "Account Service Charge" on customers who had accepted its fixed-rate balance transfer offers. On November 19, 2012, U.S. District Judge Maxine M. Chesney granted final approval of a $100 million settlement with JPMorgan Chase & Co on behalf of Chase cardholders.

***In re SLM Corp. Securities Litigation,*** Case No. 08-Civ-1029 (WHP). Girard Gibbs served as lead counsel representing investors of SLM Corporation ("Sallie Mae") in litigation alleging that Sallie Mae, the leading provider of student loans in the U.S., misled the public about its financial performance in order to inflate the company's stock price. After achieving nationwide class certification, Girard Gibbs negotiated a settlement that established a $35 million fund to resolve investors' claims.

***Wixon v. Wyndham Resort Development Corp.***, Case No. C-07-02361 JSW (BZ), (N.D. Cal. 2007). Girard Gibbs served as class and derivative counsel in this litigation brought against a timeshare developer and the directors of a timeshare corporation for violations of California state law. Plaintiffs alleged that the defendants violated their fiduciary duties as directors by taking actions for the financial benefit of the timeshare developer to the detriment of the owners

of timeshare interests.  On September 14, 2010, Judge White granted approval of a settlement of the plaintiffs' derivative claims.

*Berrien, et al. v. New Raintree Resorts, LLC, et al.,* Case No. CV-10-03125 CW (N.D. Cal.).  Girard Gibbs filed this class action on behalf of timeshare owners, challenging the imposition of unauthorized Special Assignment fees. On November 15, 2011, the Parties in the lawsuit reached a proposed settlement of the claims asserted by the Plaintiffs on behalf of all class members who were charged the Special Assessment. On March 13, 2012, the Court issued its Final Class Action Settlement Approval Order and Judgment, approving the proposed settlement.

*Browne v. Am. Honda Motor Co., Inc.,* Case No. CV 09-06750 (C.D. Cal.).  In this class action in which Girard Gibbs and co-counsel served as class counsel, plaintiffs alleged that about 750,000 Honda Accord and Acura TSX vehicles were sold with a defective braking system, causing the rear brake pads to wear prematurely.  Girard Gibbs negotiated a settlement in which improved brake pads were made available and class members who had them installed could be reimbursed in full, up to $150.  The settlement also provided reimbursements to those who replaced their brake pads before the new pads became available.  The settlement received final court approval in July 2010.

*Sugarman v. Ducati North America, Inc.* Case No. 5:10-cv-05246-JF (N.D. Cal.). Girard Gibbs served as class counsel on behalf of a nationwide class of Ducati motorcycle owners. Plaintiffs alleged that the plastic fuel tanks on certain Ducati motorcycles were defective because they degraded and deformed due to an incompatibility with the motorcycles' fuel. On January 12, 2012, the Court fully approved a settlement that provided an extended warranty and repairs for fuel tank expansion issues, and improved parts on behalf of a class of 39,000 owners of 2003-2011 Ducati motorcycles with plastic fuel tanks.

*Collado v. Toyota Motor Sales, U.S.A., Inc.,* Case No. 2:10-cv-3113-R (C.D. Cal.). Girard Gibbs served as lead counsel in this product liability class action alleging a material defect in the HID Headlight System in certain Prius models. The class settlement provided for a free warranty extension and cash reimbursements for many class members who paid for headlight repairs.

*Parkinson v. Hyundai Motor America,* Case No. CV 8:06-0345 (C.D. Cal.). Girard Gibbs served as class counsel in this class action featuring allegations that the flywheel and clutch system in certain 2003 Hyundai Tiburons were defective.  The complaint alleged that though Hyundai knew of the defect it sold the vehicles without telling its customers about the problem and did not cover the repairs under warranty.  After achieving nationwide class certification, Girard Gibbs negotiated a settlement that provided for reimbursements to class members for their repairs ranging, depending on mileage at time of repair, from 50% to 100% reimbursement.  The settlement also provided full reimbursement for rental vehicle expenses for class those members who incurred them while flywheel or clutch repairs were being performed.

*In re Sony BMG CD Technologies Litigation*, Case No.1:05-cv-09575-NRB (S.D.N.Y.). Girard Gibbs served as co-lead counsel in this class action for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* on behalf of millions of consumers who purchased SONY BMG music compact discs encoded with digital rights management ("DRM") software

which limited CD functionality and acted as spyware on the users' computers. The Hon. Naomi Reice Buchwald granted approval to a settlement that provided for a nationwide recall of certain CDs, the dissemination of software utilities to remove the offending DRM, cash and other compensation for consumers, and injunctive relief governing SONY BMG's use of DRM.

*In re iPod Cases*, JCCP No. 4355 (Cal. Super. Ct. San Mateo County). Girard Gibbs, as court appointed co-lead counsel, negotiated a settlement conservatively valued at approximately $15 million which provided warranty extensions, battery replacements, cash payments, and store credits for those class members who experienced a battery failure. In granting final approval of the settlement, the Hon. Beth L. Freeman said that the class was represented by "extremely well qualified" counsel who negotiated a "significant and substantial benefit" for the class members.

*In re PayPal Litigation,* Case No. C-02-1227-JF (PVT) (N.D.Cal., S.J. Div. 2002). Girard Gibbs served as co-lead counsel in this nationwide class action brought against PayPal alleging violations of the Electronic Funds Transfer Act ("EFTA") and California consumer protection statutes. The plaintiffs alleged that PayPal did not comply with the EFTA when restricting access to consumers' PayPal accounts, initiating certain electronic funds transfers or its error resolution processes. On September 24, 2004, Judge Fogel granted final approval to a settlement valued at $14.35 million in cash and returned funds, plus injunctive relief to ensure compliance with the EFTA.

*In re America Online, Inc. Version 5.0 Software Litigation*, MDL Docket No. 1341 (S.D. Fla.). Girard Gibbs served as co-lead counsel in this MDL proceeding, which centralized 45 class actions. The action involved alleged violations of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 et seq., federal antitrust laws and state consumer protection statutes based on AOL's distribution of its Version 5.0 software upgrade. The Honorable Alan S. Gold granted final approval to a $15.5 million cash settlement on August 1, 2002.

*In Re General Motors Dex-Cool Cases.* Case No. HG03093843 (Cal. Super Ct. Alameda County). In these class action lawsuits filed throughout the country, plaintiffs alleged that General Motors' Dex-Cool engine coolant caused damage to certain vehicles' engines, and that in certain other vehicles, Dex-Cool formed a rusty sludge, which caused the vehicles' cooling systems to overheat. After successfully certifying consumer classes in both Missouri and California, General Motors agreed to pay cash reimbursements to class members ranging from $50 to $800 per vehicle. On October 27, 2008 the California court granted final approval to the cash settlement.

*In re Providian Credit Card Cases*, J.C.C.P. No. 4085 (Cal. Super. Ct. San Francisco County). Girard Gibbs served as court-appointed co-lead counsel in this nationwide class action suit brought on behalf of Providian credit card holders. The lawsuit alleged that Providian engaged in unlawful, unfair and fraudulent business practices by charging its customers unauthorized fees and charges. The Hon. Stuart Pollack approved a $105 million settlement, plus injunctive relief, which is one of the largest class action recoveries in the United States arising out of consumer credit card litigation.

*In re Hyundai and Kia Horsepower Litigation*, Case No. 02CC00287 (Cal. Super. Ct. Orange County). Girard Gibbs served as lead counsel in this coordinated nationwide class action against Hyundai for selling more than 1 million vehicles with overstated horsepower ratings over

15

a ten year period.  The case was aggressively litigated on both sides over several years.  In all, over 850,000 Hyundai owners received notice of the settlement, resulting in over 165,000 claims for up to $225 in cash and $325 in services, and a total payout of approximately $30 million.

*In re America Online Spin-Off Accounts Litigation*, MDL No. 04-1581-RSWL (C.D. Cal.).  Girard Gibbs served as court-appointed co-lead counsel in this nationwide class action suit brought on behalf of America Online subscribers who were billed for a second account without their knowledge, authorization or consent.  The litigation settled for $25 million and certain changes in AOL's billing and account practices.

*Lehman v. Blue Shield of California*, Case No. CGC-03-419349 (Cal. Super. Ct. San Francisco County).  In this class action lawsuit alleging that Blue Shield engaged in unlawful, unfair and fraudulent business practices when it modified the risk tier structure of its individual and family health care plans, a $6.5 million settlement was negotiated on behalf of former and current Blue Shield subscribers residing in California.  The Honorable James L. Warren granted final approval of the settlement in March 2006.

*Roy v. Hyundai Motor America*, Case No. SACV 05-483-AHS (C.D. Cal.).  Girard Gibbs served as court appointed co-lead counsel in this nationwide class action suit brought on behalf of Hyundai Elantra owners and lessees, based on allegations that the passenger air bag system installed on the Elantras was defective.  A settlement was negotiated whereby Hyundai agreed to repair the air bag systems, provide reimbursement for transportation related expenses and an alternative dispute resolution program allowing for trade-ins and buy-backs.  In approving the settlement negotiated by Girard Gibbs, the Honorable Alicemarie H. Stotler presiding, described the settlement as "pragmatic" and a "win-win" for all involved.

*Telestar v. MCI, Inc.*, Case No. C-05-Civ-10672-JGK (S.D.N.Y).  This class action was brought on behalf of MCI commercial subscribers who were charged both interstate and intrastate fees for the same frame relay on prorate line service during the same billing period.  On April 17, 2008, the Honorable John G. Koeltl granted final approval of a settlement for over $2.8 million in cash.

*Powers Law Offices, P.C. v. Cable & Wireless USA, Inc.*,  Case No. 99 CV 12007 (EFH) (D. Mass 1999).  Class action brought on behalf of all Cable & Wireless subscribers who were overcharged for recurring and incorrect fees on lines that were not presubscribed to C&W at the time.  Girard Gibbs prosecuted the case from 1999 through 2005, and on October 27, 2005, Judge Harrington granted final approval of the $8 million settlement and the Bankruptcy Judge approved the 30% distribution from the unsecured creditors' fund of the bankruptcy liquidation proceeds.

*Allen Lund Co., Inc. v. AT&T Corp.,* Case No. C 98-1500-DDP (AJW) (C.D. Cal.).  This class action lawsuit was brought on behalf of small businesses whose long-distance service was switched to Business Discount Plan, Inc. Girard Gibbs was appointed class counsel by the Honorable Dean D. Pregerson.  The settlement, providing for full cash refunds and free long-distance telephone service, was approved in December 1999.

*In re MCI Non-Subscriber Telephone Rates Litigation*, MDL Docket No. 1275 (S.D. Ill.).  This class action lawsuit was brought on behalf of all MCI subscribers who were charged

16

MCI's non-subscriber or "casual caller" rates and surcharges instead of the lower rates which MCI advertises and which subscribers expect to be charged.  Ten cases were consolidated for pretrial proceedings before the Honorable David R. Herndon, U.S. District Judge for the Southern District of Illinois.  Judge Herndon appointed Girard Gibbs as co-lead counsel for the consolidated actions.  On March 29, 2001, Judge Herndon granted final approval of a settlement for over $90 million in cash.

*Mitchell v. American Fair Credit Association*, Case No. 785811-2 (Cal. Super. Ct. Alameda County); *Mitchell v. Bankfirst, N.A.*, Case No. C-97-1421-MMC (N.D. Cal.).  This class action lawsuit was brought on behalf of California residents who became members of the American Fair Credit Association ("AFCA").  Plaintiffs alleged that AFCA operated an illegal credit repair scheme.  The Honorable James Richman certified the class and appointed the firm as class counsel on April 12, 1999.  In February 2003, Judge Ronald Sabraw of the Alameda County Superior Court and Judge Maxine Chesney of the U.S. District Court for the Northern District of California granted final approval to settlements valued at over $40 million.  *See Mitchell, et al., v. American Fair Credit Association, Inc., et al.*, 99 Cal. App. 4th 1345 (2002) (first reported decision under the California Credit Services Act of 1984).

*In re LookSmart Litigation*, Case No. 02-407778 (Cal. Super. Ct. San Francisco County).  This nationwide class action suit was brought against LookSmart, Ltd. on behalf of LookSmart's customers who paid an advertised "one time payment" to have their web sites listed in LookSmart's directory, only to be later charged additional payments to continue service.  The action involved claims for breach of contract and violation of California's consumer protection laws, among other things.  On October 31, 2003, the Honorable Ronald M. Quidachay granted final approval of a nationwide class action settlement providing cash and benefits valued at approximately $20 million.

*Steff v. United Online, Inc.*, Case No. BC265953, (Los Angeles Super. Ct.).  This nationwide class action suit was brought against NetZero, Inc. and its parent, United Online, Inc., by former NetZero customers.  The Plaintiffs alleged that Defendants falsely advertised their internet service as being unlimited and guaranteed for a specific period of time when it was not, in violation of Consumers Legal Remedies Act, Civil Code §§ 17500 et seq. and the Unfair Competition Law, Business And Professions Code §§ 17200 et seq.  The Honorable Victoria G. Chaney of the Los Angeles Superior Court granted final approval of a settlement that provides full refunds to customers whose services were cancelled and additional cash compensation.  The settlement also places restrictions on Defendants' advertising.

*Mackouse v. The Good Guys - California, Inc.*, Case No. 2002-049656, (Alameda County Super. Ct.).  This nationwide class action lawsuit was brought against The Good Guys and its affiliates alleging violations of the Song-Beverley Warranty Act and other California consumer statutes.  The Plaintiff alleged that The Good Guys failed to honor its service contracts, which were offered for sale to customers and designed to protect a customer's purchase after the manufacturer's warranty expired.  In May 9, 2003, the Honorable Ronald M. Sabraw granted final approval of a settlement that provides cash refunds or services at the customer's election.

*Stoddard v. Advanta Corp.*, Case No. 97C-08-206-VAB (Del. Superior Ct.).  This nationwide class action lawsuit was brought on behalf of cardholders who were promised a fixed

APR for life in connection with balance transfers, whose APR was then raised pursuant to a notice of change in terms. The Honorable Vincent A. Bifferato approved a $7.25 million settlement and appointed firm as co-lead counsel for the settlement class.

***Mager v. First Bank of Marin***, CV-S-00-1524-PMP (D. Nev.). This nationwide class action was brought on behalf of people who were enrolled in First Bank of Marin's credit card program. In May 2002, the Judge Pro of the U.S. District Court for the District of Nevada approved a settlement providing for cash and non-cash benefits to class members.

***In Re Medtronic, Inc. Implantable Defibrillators Product Liability Litigation***, MDL No. 05-1726 (JMR/AJB) (D.Minn.). Girard Gibbs served on the Discovery and Law Committees and provided legal, discovery and investigative support in this lawsuit, following a February 2005 recall of certain models of Medtronic implantable cardioverter defibrillator ("ICD") devices. Approximately 2,000 individual cases were filed around the country and consolidated in an MDL proceeding in District Court in Minnesota. The approximate 2,000 cases were settled in 2007 for $75 Million.

***Billiteri v. Securities America, Inc.,*** Case No. 3:09-cv-01568-F (N.D. Tex.). Girard Gibbs served as lead counsel in an action against broker-dealer Securities America, Inc. and its corporate parent, Ameriprise, Inc. in connection with sales of investments in the Provident Royalties and Medical Capital investment schemes. Daniel Girard coordinated negotiations resulting in a $150 million settlement, with $80 million allocated to class plaintiffs represented by Girard Gibbs and $70 million allocated to individual investors who had initiated arbitration proceedings. The settlements returned over 40% of investment losses.

***In re American Express Financial Advisors Securities Litigation,*** Case No. 04-cv-01773-DAB (S.D.N.Y.). Girard Gibbs served as co-lead counsel in this class action, brought on behalf of individuals who bought financial plans and invested in mutual funds from American Express Financial Advisors. The case alleged that American Express steered its clients into underperforming "shelf space funds" to reap kickbacks and other financial benefits. On July 13, 2007, the Court granted final approval to a cash settlement of $100 million in addition to other relief.

***Scheiner v. i2 Technologies, Inc., et al.***, Case No. 3:01-CV-418-H (N.D. Tex.). Girard Gibbs represented lead plaintiff, the Kansas Public Employees Retirement System, and served as co-lead counsel in this securities fraud class action on behalf of investors in i2 Technologies. The Hon. Barefoot Sanders approved cash settlements for $88 million from the company, its officers and its former auditor, Arthur Andersen LLP. As part of the settlement, i2 agreed to institute significant corporate governance reforms.

***CalSTRS v. Qwest Communications, et al.,*** Case No. 415546 (Cal. Super. Ct. San Francisco County). Girard Gibbs represented the California State Teachers Retirement System in this opt-out securities fraud case against Qwest Communications, Inc. and certain of its officers and directors, as well as its outside auditor Arthur Andersen. The case resulted in a precedent-setting $45 million settlement for California school teachers.

***In re Winstar Communications Securities Litigation***, Case No. 01 Civ. 11522 (S.D.N.Y) Girard Gibbs represents Allianz of America, Inc., Fireman's Fund and other large private institutional investors in federal securities litigation against Grant Thornton and other defendants

arising out of their investments in Winstar Communications, Inc.  The firm has obtained settlements to date from Lucent Technologies and the individual officers and directors of Winstar, and is continuing to prosecute the case against Grant Thornton, outside auditor to Winstar.

*In re Prison Realty Securities Litigation*, Case No. 3:99-0452 (M.D. Tenn.).  Girard Gibbs served as co-lead counsel in this securities class action brought on behalf of investors against a real estate investment trust and its officers and directors, following defendants' alleged false statements made in the context of a merger between Corrections Corporation of America and CCA Prison Realty Trust and subsequent operation of the merged entity.  On February 13, 2001, the Court granted final approval to a settlement for over $120 million in cash and stock.

*In re Digex, Inc. Shareholder Litigation*, Consol. Case No. 18336 (Del. Ch. Ct. 2000).  Girard Gibbs represented the Kansas Public Employees Retirement System, one of two institutional lead plaintiffs in this lawsuit whereby minority shareholders of Digex, Inc. sued to enjoin MCI WorldCom's planned acquisition of a controlling interest in Digex through a merger with Intermedia Communications, Inc., the majority shareholder.  In a settlement approved by Delaware Chancery Court on April 6, 2000, a fund consisting of $165 million in MCI WorldCom stock and $15 million in cash was secured for Digex shareholders, as well as non-cash benefits valued at $450 million.

*In re Oxford Tax Exempt Fund Securities Litigation*, Case No. WMN-95-3643 (D. Md.).  Girard Gibbs served as co-lead counsel in this class and derivative litigation brought on behalf of a real estate limited partnership with assets of over $200 million.  Settlement providing for exempt issuance of securities under section 3(a)(10) of Securities Act of 1933, public listing of units, and additional settlement benefits valued at over $10 million approved January 31, 1997.

*Calliott v. HFS, Inc.*, Case No. 3:97-CV-0924-L (N.D. Tex.).  Girard Gibbs intervened on behalf of an institutional client in this securities class action arising out of bankruptcy of Amre, Inc., a seller of home remodeling and repair services.  Girard Gibbs was designated lead plaintiff's counsel under Private Securities Litigation Reform Act.  Settlements for $7.3 million were approved August 1999 and December 2000.

*In re Total Renal Care Securities Litigation*, Case No. 99-01750 (C.D. Cal.).  This securities fraud action arose out of restatement of earnings by healthcare provider, brought under the PSLRA by the Louisiana Teachers' Retirement System and the Louisiana School Employees Retirement System.  Settled for $25 million and issuer's commitment to adopt comprehensive corporate governance reforms. Girard Gibbs served as liaison counsel.

*In re Towers Financial Corporation Noteholders Litigation*, MDL No. 994 (S.D.N.Y.).  This securities and RICO class action was brought against promoters and professionals associated with failed investment scheme described by United States Securities and Exchange Commission as "largest Ponzi scheme in U.S. history."  $6 million in partial settlements.  $250 million judgment entered against four senior Towers executives.  Girard Gibbs served as liaison counsel and as a plaintiffs' executive committee member.  See Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin, 945 F. Supp. 84 (S.D.N.Y.1996), rev'd, No. 97-7011, 1998 U.S. App. LEXIS 1448 (2d Cir. Jan. 28, 1998); In re Towers Financial Corporation Noteholders

Litigation, 177 F.R.D. 167 (S.D.N.Y. 1997) ("class counsel--particularly Plaintiffs' Liaison counsel, Daniel Girard--has represented the plaintiffs diligently and ably in the several years that this litigation has been before me").

***In re TFT-LCD (Flat Panel) Antitrust Litigation***, MDL 1827 (N.D. Cal.).  Girard Gibbs serves as liaison counsel in this multi-district antitrust litigation against numerous TFT-LCD (Flat Panel) manufacturers alleging a conspiracy to fix prices, which has achieved settlements of more than $400 million to date.

***In re Natural Gas Antitrust Cases I, II, III and IV***, J.C.C.P. No. 4221 (Cal. Super. Ct. San Diego County).  Girard Gibbs served in a leadership capacity in this coordinated antitrust litigation against numerous natural gas companies for manipulating the California natural gas market, which has achieved settlements of nearly $160 million to date.

***Ho v. San Francisco Unified School District***, Case No. C-94-2418-WHO (N.D. Cal.). This civil rights action was brought on behalf of a certified class of San Francisco public school students of Chinese descent to terminate racial and ethnic quotas imposed under 1983 desegregation consent decree. See Ho v. San Francisco Unified Sch. Dist., 965 F. Supp. 1316 (N.D. Cal. 1997), aff'd 147 F.3d 854 (9th Cir. 1998); see also 143 Cong. Rec. S6097, 6099 (1997) (statement of United States Senator Hatch referring to testimony of class representative before Senate Judiciary Committee).